STATE v. PENN MUTUAL LIFE INSURANCE COMPANY.[1]

No. 30,888.

September 25, 1936.

[1]Reported in 269 N. W. 37.

*James E. Gardner*, for appellant.

*Thomas J. Naylor*, County Attorney, and *Charles E. Adams*, for the State.

*Fryberger, Fulton & Boyle, Abbott, MacPherran, Dancer, Gilbert & Doan, Alford & Hunt, Hunt & Palmer*, and *I. K. Lewis, amici curiae*, filed a brief in support of the contention of appellant.

HOLT, JUSTICE.

Defendant appeals from the order denying its motion for a new trial in the delinquent tax proceedings to enforce the taxes for the years 1932 and 1933 as to lot 105 in block 17, Duluth Proper, Third Division, commonly known as Nos. 617-619, West Superior street, in the city of Duluth. The defenses were excessive valuation of the lot and discrimination. By stipulation the 1933 tax is to abide the decision in respect to the 1932 tax, since there is no assessment of real estate in the odd-numbered years. There was no evidence offered of discrimination, and the sole assignment of error attacks the finding that the true and full value of the lot was $13,500 as not sustained by the evidence. It is conceded that the building thereon was of the value assessed, *viz.*, $2,000.

The lot in question, 50 by 140 feet, is on the upper or northerly side of West Superior street, about in the middle of the block between Sixth and Seventh avenues west. It is improved by a one-story brick building of 50 by 50 feet. There is no basement or heating plant. It is divided into four stores, each with a frontage of 12½ feet. The rear of the lot is rocky and slants upward to the alley, which is well above Superior street at that point. The assessor assessed the true and full value of the lot, exclusive of the building, at $18,650.

1 Mason Minn. St. 1927, § 1980, contains the rules to be applied in the taxation of all property, among which this, in subd. 5, is here pertinent:

" 'True and full value' shall mean the usual selling price at the place where the property to which the term is applied shall be at the time of the assessment; being the price which could be obtained therefor at private sale, and not at forced or auction sale."

And § 1992, as far as here applicable, provides:

"All property shall be assessed at its true and full value in money. In determining such value, the assessor shall not adopt a lower or different standard of value because the same is to serve as a basis of taxation, nor shall he adopt as a criterion of value the price for which the said property would sell at auction or at a forced sale, \* \* \* but he shall value each article or description of property by itself, and at such sum or price as he believes the same to be fairly worth in money," etc.

In 1927 § 1992-1 was enacted, reading:

"It shall be the duty of every assessor and board, in determining the value of lands for the purpose of taxation and in fixing the assessed value thereof, to consider and give due weight to every element and factor affecting the market value thereof, including its location with reference to roads and streets and the location of roads and streets thereon or over the same."

Of course the statutory directions for the assessors are also for the courts when it comes to finding the true and full value of property in delinquent tax proceedings.

It is plain from the statutes above quoted that the aim is to assess property at its market or sales value as distinguished from its cost price or intrinsic value. A lot or parcel of land may be improved by an expensive manufacturing structure capable of producing great revenue when built, but conditions may have changed so that it cannot be operated except at a loss, and it has only a wrecking value. Such a case was presented in State v. Russell-Miller Milling Co. 182 Minn. 543, 235 N. W. 22. But where there has been a long continued financial depression which has so affected real estate that no sales or dealings in real estate have taken place in the vicinity of the lot or parcel of land to be valued for assess-

ment purposes, it is almost impossible to ascertain the market or sales value thereof. When property does not move, whether from want of willing sellers or willing buyers, its sales value in money must necessarily become much a matter of judgment based upon many factors, whose weight may not influence alike the minds of persons qualified to judge. The one upon whom the duty eventually falls to determine such value must fix it "at such sum or price as he believes the same to be fairly worth in money." When the court finds the value of real estate in a delinquent tax proceeding such finding must be based upon the testimony adduced at the trial. It is not for this court to overthrow the finding of value of the trial court unless manifestly against the weight of the evidence.

Defendant called two real estate agents as to value, Stephenson and Bowman. Stephenson, who had had charge of the property for some years, had tried to sell it for $6,500, but received only a tentative offer of $5,500, with a down payment of $500. The deal did not go through. The net rentals for the years 1931 to 1934 averaged only $199.50 a year. It does, however, appear that at intervals each store rented for from $20 to $40 a month. It might seem that the division of the building into four narrow stores affected the rentability thereof. Mr. Stephenson valued the property at $6,000 and Mr. Bowman as high as $6,500. This included the building. Of late years Mr. Bowman had also engaged in other business than real estate. Mr. Stephenson was apparently a young man of limited experience in business. The state called the assessor, Mr. Scott, and his assistant, who testified that they considered the true and full value of the lot in May, 1932, to be $18,650. Mr. Scott had been assessor of the city of Duluth for 25 years. He had been in the real estate business in Duluth for 20 years preceding becoming assessor. He kept track of transfers and sales as recorded so as to be in touch with values. His assistant had been such for more than ten years, appraising particularly improvements as they were made. At intervals he had done work for the state tax commission, appraising for taxing purposes lands in certain municipalities and taxing districts. The record discloses also that this property was assessed in 1914 for more than $44,000. It concededly was at one

time sold for $40,000, was mortgaged for $15,000, later for $10,000, and in 1930 for $6,000, through the foreclosure of which mortgage defendant obtained title, bidding it in at the sale for $6,087. It should also be stated that the lot fronts the main business street of the city and is near the depot and wharfs. The new federal buildings and the courthouse are within a very short distance. On each corner of block 17 is a hotel, The Lennox, on the southeasterly corner, being a substantial six-story building. It is true that Scott and his assistant both admitted that they did not know whether or not the property could be sold for $7,000. It appears that much of the business property on Superior street is under long-term leases, which may account for the scarcity of sales of titles in fee. The witnesses agreed that for years there had been no sales of which they had knowledge in said block 17, or in adjoining block 18, or in the immediate vicinity, which could serve as a guide to the sales value of the lot in question. Although there are no sales to establish market value of lands, they must be assessed. As said in State v. Fritch, 175 Minn. 478, 479, 221 N. W. 725, 726:

"Taxes have to be levied, and to that end assessors must make valuation of real estate every two years regardless of whether any of the lands could or could not then be sold. * * * Where there have been no actual sales for a long period of time, there is no way of determining values except by the judgment and opinion of men acquainted with the lands, their adaptability for use, and the circumstances of the surrounding community. The trial court could also take into account the qualification of the witnesses and their attitude towards the litigants."

The three cases in this state cited and relied on by defendant are In re Taxes of Potlach Timber Co. 160 Minn. 209, 199 N. W. 968; State v. Russell-Miller Milling Co. 182 Minn. 543, 235 N. W. 22; State ex rel. City of South St. Paul v. McNiven, 183 Minn. 539, 237 N. W. 410. In the first two the finding of value was held not sustained. In the Potlach Timber Company case, by a divided court—three to two—the commissioners did not have a vote. In the Russell-Miller Milling Company case the chief value was in the im-

provements—the mill. Conditions had so changed that the mill, though once very profitable, could not be operated except at a loss, and unsuccessful efforts had been made to sell the property for one-third of the court's valuation. In that case the assessor as a witness admitted that he had taken the intrinsic value instead of the sales value in making the assessment. The McNiven case is not in point, for there the decision of the tax commission in reducing an assessment was sustained.

Defendant and *amici curiae* stress the consideration to be given the income derived from improved property in fixing its sales value, and to that end cite State ex rel. N. W. Mut. L. Ins. Co. v. Weiher, 177 Wis. 445, 188 N. W. 598, quoted from with approval both in the Potlach and the Russell-Miller cases. Of course income is a large factor in arriving at sales value of property; it is not the sole criterion. And the Weiher case is not an authority for overthrowing the finding of the court here. There the court's finding of value of the building was sustained. The assessment of the land upon which the building stood was not questioned. The assessor had valued the building principally on its intrinsic value and not on its sales value. Because real estate is improved and its income can be determined, it must still be assessed on its market or sales value the same as its adjoining unimproved parcel. The facts that go to establish sales value in the one case must also do so in the other insofar as proved.

We think sufficient from the contents of the record has been pointed out to show that the evidence sustains the finding of the trial court that defendant's lot, exclusive of the building, was of the true and full value of $13,500 on May 1, 1932.

The order is affirmed.

STONE, JUSTICE (dissenting).

I cannot agree in the result for the simple reason that I disapprove of the process by which it is, and only by which it can be, reached. That process seems to me but the adoption of an opinion on the facts when it is supported by none and opposed by all the facts.

My inability to concur is due wholly to the fact that to me the evidence falls far short of showing that "the price which could be obtained  *  *  *  at private sale" rather than a "forced or auction sale" is substantially below $15,500. The valuation of the building at $2,000 is important only because there is no suggestion that it is out of repair, or untenantable, or that other or different improvement could get more rental income.

*Only* Mr. Scott, the assessor, and his assistant, Mr. Carlson, testified in support of their valuation. On direct examination Mr. Carlson expressed the opinion that the value of the whole property was "approximately $20,000." He nullified his conclusion by stating that "the actual value" which he was attempting to fix "should be what would be a fair value for the property in normal conditions." Obviously he was ignoring the depressed conditions, both those general ones of our now long continued hard times, and the special ones, to be dealt with later, affecting this particular property. His appraisal is so far based upon an assumed future recovery of value, rather than the present worth, that it furnishes no support for his opinion.

Mr. Scott's opinion was that the lot, exclusive of the building, was worth, in May, 1932, $18,650 (the figure at which it was assessed). We postpone to another paragraph consideration of certain circumstances which he advanced in support of his judgment. His ultimate conclusion was based, so he testified, upon "a difference between the sale value or market value and actual value." He admitted that "the sales value should relate only to ordinary conditions and not to a forced sale or auction sale nor political upheaval sales" and should be measured by "ordinary conditions as existing over a long period of years." He would probably go back "as far as my records go here, studying the business and the town and the prospects" to arrive at a "fair value." As of May 1, 1932, his considered judgment, as stated by himself, appears to have been that "there was practically no actual [sale] value. There was many sellers without purchasers," with very many "distress offers." Foreclosures were numerous. He admitted that his opinion was based upon what he called "intrinsic," rather than sales, value and *doubted*

*that the lot could have been sold, at any time during the last five years, for $7,000. He was not sure that it could have been sold, under the existing conditions, for any price.* One factor, he said, bearing especially hard upon this block is that it is "particularly depressed with long-time leases and everybody trying to get out from under."

For defendant were two witnesses, both realtors. One, Mr. Stephenson, had been managing the property for some time. It was acquired by defendant upon mortgage foreclosure in February, 1933, for $6,087.75. The mortgagor's efforts to sell her equity of redemption had failed. Afterwards, and up to the time of trial, defendant's agents had tried to move it for $6,500, with no results save a tentative offer of $5,500 with a down payment of $500. That deal did not go through. For the years 1931 to 1934, inclusive, the net rentals, *before payment of taxes and with no charge for overhead or allowance for depreciation,* averaged $199.50. Mr. Stephenson valued the property at a maximum of $6,000. Mr. Bowman appraised it at a top figure of $6,500. He had extended experience in making appraisals, for commercial purposes, of Duluth real estate. Both stressed the presence of the adverse, and absence of the favorable, influences later to be mentioned. *Opposed was no testimony showing the existence in fact of elements upon which to base a higher appraisal.*

Speculative factors of value are to be considered but only for the worth they add presently and not for some conjectural addition they may possibly make in the future. That distinction is often difficult of application. A pending development may add real worth to all property within its influence. Again, where a new project remains altogether conjectural, it would flout all rules of proof and decision for the trier of facts to give it weight simply because some witness has ventured prediction as to the distant and exceedingly uncertain future. For example, the Great Lakes-St. Lawrence Waterway, as far as we can see, is still too much of a sitter, not in the lap of the gods, but rather in that of politicians representing eastern, and particularly New York and Montreal, opposition, to have actually increased the value of real estate in Duluth. If,

perchance, it is otherwise in fact, we must be shown by proof. In weighing elements of speculation in present value, both assessors and judges are required by the law to be soundly realistic rather than conjecturally prophetic or blindly hopeful. It is actual, present value that they must determine and not future worth.

In the instant case there is scant, if any, evidence of speculative value. The record shows no special promise of increased value for this lot for a long time to come. True, it is within three blocks of Duluth's civic center with its fine courthouse and other public buildings. But it is on the wrong side to have gained as yet any proved increment of value. Duluth's development for nearly ten years, and the trend of increased values, as disclosed by the evidence, has been westerly and away from this property, rather than easterly, toward it.

The property is located in what has been called the "Bowery" of Duluth. It was formerly much frequented by a large, picturesque, free-spending, floating population. Their trade was the mainstay of its business. Of their component classes, the lumberjacks are now but a memory of more affluent and generous times. The miners, too, are gone. They may return, but the record is silent as to how soon or when. In a third group are the longshoremen and sailors— not gone, but much diminished both numerically and financially. They seem to do their spending in other portions of the city. When, if ever, they will return to the "Bowery" no one can know. The whole picture as sketched by the present record negatives ponderable elements of even speculative present value. Remains only the general one that all of us hope for improvement, as we have been doing for upwards of five years. Evidence of such mere hope, without more, establishes nothing but its own existence. Nor can it do more until the hope is converted into a confidence of the kind that leads to investment of money or, at very least, some expression of a willingness to invest it in the subject matter.

The valuation of defendant's property, even as reduced below, should be taken on this record as one which did not make enough allowance for the effects of the depression and other proved adverse influences.

Even before the depression struck, value of all property in the Duluth "Bowery" had been much reduced by local trends. Business had been moving to other sections of the city. The whole block was not helped by the location across Superior street of the passenger terminal of the "Soo Line" Railway. Even in the "horse-and-buggy days" the substitution of such a terminal for the ordinary run of business houses, including places of amusement and refreshment, would not have helped the opposite property. Since motor traffic has so much reduced the passenger business of railways, the deleterious effect is increased tremendously. That factor was stressed by evidence in In re Taxes of Potlach Timber Co. 160 Minn. 209, 199 N. W. 968.

It is apparent that had the issue been, as here, one merely of excessive valuation, not extending into the constitutional field of due process, the judges dissenting in G. N. Ry. Co. v. Weeks, 297 U. S. 135, 56 S. Ct. 426, 80 L. ed. 396, would have been in agreement as to result. Eliminating the constitutional question, even the dissenting opinion is authority for the proposition (the majority view is expressly so) that this case and its single issue of value is to be considered (the presumption attending the assessment itself being refuted by the facts and decision below) precisely as though it were a condemnation case, and the state, or the city of Duluth, or the county of St. Louis were held to pay $15,500 for the bare lot. If this were a condemnation proceeding, such a finding of value could not be sustained on the present record.

Earnings, gross or net, are seldom, if ever, the sole test of value. But they are a highly important factor when, as here, the only use of the property is to produce rental income. In a condemnation case the Supreme Court of the United States said:

"The value of property, generally speaking, is determined by its productiveness—the profits which its use brings to the owner. Various elements enter into this matter of value. Among them we may notice these: Natural richness of the soil as between two neighboring tracts—one may be fertile, the other barren; the one so situated as to be susceptible of easy use, the other requiring much labor and large expense to make its fertility available. Neighbor-

hood to the centers of business and population largely•affects values. For that property which is near the center of a large city may command high rent, while property of the same character, remote therefrom, is wanted by but few, and commands but a small rental. Demand for the use is another factor." Monongahela Navigation Co. v. United States, 148 U. S. 312, 328, 13 S. Ct. 622, 627, 37 L. ed. 463, 468.

Here, in spite of its location near "centers of business," and because of *proved, adverse conditions,* no improvement in which is reasonably predicted by evidence or aught within judicial knowledge, the property cannot "command high rent." After payment of taxes, there is, and for many years there has been, a loss. For some time only two of the four store rooms in the building have had tenants. Such 50 per centum occupancy or less for long has prevailed in the whole block. In the block next to the west the condition is worse. Where, as here, the property is not used by the owner for his own purposes and there is no evidence that other than the present use would make the property more profitable, it goes without saying that, the other factors being as they are, speculative present value being almost if not quite absent, very low earnings over a long period, under management that is not criticized, go almost, if not quite, to the point of making impossible a valuation relatively high in proportion to one based on a capitalization of established earning capacity.

We are acutely aware of the disarranging impact which a reversal would have upon the executive and administrative work of assessing real property for taxation in this state. That affords us no escape from, and can justify no evasion of, our duty to apply the law, as made by the legislature, to the facts of the case. On the present record, I can see no way to discharge that duty other than by a reversal and an order for a new trial. Affirmance encourages by so much the prevalent habit of passing on to owners of real estate the residual burden of government upkeep remaining after all other present sources of revenue are exhausted. By so much we add judicial encouragement to the failure to give our tax structure

the overhauling it needs in the interest of real estate owners, who for long have borne much more than their share of the burden. That adds nothing of legal justification for my own conclusion. But it does suggest a very desirable result which might attend its adoption.

The rule for assessing at "true and full" value is the same for urban business lots (with one of which we are now concerned) as for all our taxable lands, whatever their use or location. That urban property is bearing at least its full load of taxation and responding by payment somewhat better than all other real estate is shown by the records of the Minnesota tax commission. As of January 1, 1936, the three most populous counties, Ramsey, Hennepin, and St. Louis, had 50.6 per cent of the total real estate valuation of the state. But, as of the same date, only 35.6 per cent of the total delinquency was chargeable to them. Furthermore, they carry a disproportionately large amount of the local tax disadvantage resulting from the gross earnings taxation of the real estate of public utilities. In 1930, according to the report of Mr. E. A. Young, as assessor of Ramsey county, $47,452,403, or an amount equal to 12 per cent of the total locally taxed real estate valuation of the county, was taxed under gross earnings tax laws and therefore exempt from local taxation. For the community, such tax disadvantage may be offset in part by the economic advantage resulting from the special uses of the locally untaxed property. But that general benefit does not much comfort the owner who, in the particular case, must suffer a loss because the best earnings that diligence can secure for his property will not pay the annually recurring taxes thereon.

Ostrich-like, we would be but self-blinded to inescapable fact if we did not realize that much of property value actually existing in former, more prosperous years had disappeared. When, if ever, it will return in whole or in part no one knows. It has not returned yet, and assessors, no more than anyone else, for any practical purpose (and taxation is exceedingly and painfully practical), can base values upon elements the absence of which is demonstrated. The admonition to tax at real rather than assumed or hoped for

value is not judge-made. It comes from the lawmakers, representing the people in that function and for that purpose. To tax-gatherers it declares, in effect, "Tax you must, but loot you shall not."

LORING, JUSTICE (dissenting).

I concur in the dissent.

UPON APPLICATION FOR REARGUMENT.

On October 9, 1936, the following opinion was filed:

PER CURIAM.

Appellant asks for a rehearing on the ground that in the opinion filed the contention that the decision of the trial court runs counter to U. S. Const. Amend. XIV, was not determined. Having held that the evidence sustains the finding of value made by the trial court, it is not perceived how there can be a violation of the fourteenth amendment, for the tax rate levied upon the assessed valuation was not attacked in the appeal.

The petition for a rehearing is denied.

