## RED OWL STORES, INC. v. COMMISSIONER OF TAXATION AND ANOTHER.

117 N. W. (2d) 401.

October 11, 1962—No. 38,418.

*Harold C. Evarts* and *Best, Flanagan, Lewis, Simonet & Bellows,* for relator.

*Walter F. Mondale,* Attorney General, and *Ralph W. Peterson,* Special Assistant Attorney General, for respondent commissioner.

*George X. Connor,* for respondent school district.

NELSON, JUSTICE.

Writ of certiorari on the relation of Red Owl Stores, Inc., to review a decision of the Board of Tax Appeals affirming an order of the commissioner of taxation which denied relator's application for reduction in assessed value of certain real estate in the city of Hopkins.

Hopkins Realty Company is the owner of the tract involved in these proceedings and leased it to relator. Under the lease relator is required to pay all real estate taxes. Relator's principal offices, warehouse and loading facilities, a bakery, and a retail grocery store are located on this tract.

On June 3, 1955, relator obtained from the city of Hopkins a building permit to erect a loading dock 18,000 square feet in area at an estimated cost of $83,000. The loading dock was completed prior to May 1, 1956, the date of the assessment here involved.

In December 1956 relator obtained a building permit for the erection of a produce warehouse at an estimated cost of $485,000. No work had been done on May 1, 1956, except for leveling the site and placing some footings. The actual construction was commenced in June 1957. Upon construction this warehouse was visible to anyone approaching from the east.

Arthur S. Nash, a city councilman and a former assessor, made the formal assessment involved here. After being appointed city assessor in February 1956 Clifford R. Peterson adopted this assessment, entered it in the assessment book, and forwarded it to the county auditor. The assessment was entered with a full and true value of $1,102,220. The full and true value of the land was placed at $31,300 and the building at $1,070,920. The assessed valuation was thereupon shown at $440,888.

When relator received its 1956 tax statement in March 1957, William Dixon, an employee of its real estate department, noticed that an increase in the real estate valuation had been made. He contacted Mr. Peterson to determine the reasons for the increased valuation. At a conference Peterson advised Dixon that the increased valuation resulted from the assumptions on his part that the loading dock contained 56,410 square feet and that this dock and the produce ware-

house had been constructed as additions to relator's property since the making of the last assessment in 1954. Peterson and Dixon then computed the amount of the assessment attributable to those assumptions and came up with a figure of $110,000 for the warehouse and $43,020 for the loading dock. The assessor told Dixon that the 1956 assessment should have been the same as the 1954 assessment except for the addition of $20,160 for the loading dock area and that he would prepare an application for reduction in the assessed value of relator's real estate. When he had done so and the application had been signed by Dixon in behalf of relator, Peterson forwarded it to the county auditor accompanied by a letter stating:

"Attached is an application for reduction in the assessed valuation of real estate for Red Owl Stores Inc.

"You will find that this applies for a reduction of assessed value from $440,888. to $379,680.

"This is brought about in the following manner, we used a set of proposed plans for a warehouse and loading dock and computed all of our figures on this basis. We should have used 17880 sq. feet for the loading dock or an addition of $8,364.00 in assessed valuation to the old figure of $371,316.00 or a new total of $379,680.00. As the loading dock was the only addition to the building in 1956."

This letter may well be considered the real gist of the controversy. Dixon knew nothing about its contents. Peterson never advised the county auditor, the supervisor of assessments, or the county board that the letter was false in any respect, nor did he so advise the commissioner of taxation or any employee in the department of taxation. However, both at the hearing before the commissioner and at the hearing before the board, Peterson testified that his statements to Dixon and those made in the letter attributing the increased valuation to erroneous valuation of the loading dock and of a nonexistent warehouse were false and that he had made them under protest and upon the instructions of Mr. Frizzell, then Hopkins city manager. Peterson testified that he had used the idea of mistake as a peg to effect a lower assessment in accordance with the city manager's prearranged plan and instructions.

When the application was sent to the county auditor, Peterson had placed a stamp thereon indicating his approval of the application and had attached his signature even though he knew the application was false.

In September 1957 George D. Sund, an appraiser in the office of the Hennepin County supervisor of assessments, first saw and examined the application. He found that the word "not" had been written in front of the word "approved" over Peterson's signature. The record does not show who had written the word "not" on the application. Sund in his routine processing of the application made an appraisal of relator's buildings and arrived at a fair market value of $3,554,825 as of May 1, 1956. Acting pursuant to a directive from the supervisor of assessments, he applied a percentage of 35 percent of fair market value and arrived at a full and true value of $1,244,251. Relator was thereafter notified by the county auditor that its application had been denied. Dixon and relator's president then conferred with the supervisor of assessments, who told them that he could not approve the application because Peterson, the local assessor, had not approved it. Later, in Dixon's presence Mr. Alexander, the deputy county auditor, telephoned Peterson and asked him if he would approve the application. Apparently, the application was approved because the word "not" has been deleted.

In May 1958 Lester H. Schwartz, employed by the Department of Taxation of the State of Minnesota as a property appraiser, inspected the Red Owl properties at Hopkins and subsequently appraised them as of May 1, 1958, and as of May 1, 1956. He found their fair market value $3,925,122 in 1956. About the same time he appraised the National Food Stores properties in Hopkins as of May 1, 1956, and the Super Valu properties there as of May 1, 1957. Both are similar in nature and use to relator's properties. These appraisals were made at the request of the city. The application was approved by the county auditor March 11, 1958, after the supervisor of assessments approved it "with reservations asking for State Tax Department analysis." After a hearing before the commissioner of taxation, the application was denied. Relator appealed from the ruling of the com-

missioner to the Board of Tax Appeals, Independent School District No. 274 intervening in the proceedings before the board. After hearing, the board also denied relator's petition. Relator obtained the writ of certiorari to review the board's decision.

1.   Minn. St. 271.10, subd. 1, provides that a review by this court of any final order of the Board of Tax Appeals may be had upon certiorari upon petition of any party to the proceedings on the grounds that the board was without jurisdiction, that its order was not justified by the evidence or was not in conformity with law, or that the board committed any other error of law. Section 271.06 provides that a taxpayer may appeal from an order of the commissioner of taxation to the board. A decision of the commissioner comes to the board with prima facie validity and no more. If the appellant appears, the case is tried de novo, which means that either party may introduce evidence and the decision of the board is therefore based upon all the evidence placed before it. In reviewing an order or determination of an administrative board this court will go no further than to determine whether the board kept within its jurisdiction; whether it proceeded on a correct theory of law; whether its action was arbitrary or unreasonable and represented its will and not its judgment; and whether the evidence was such that it could reasonably make the determination in question. A decision of the Board of Tax Appeals will not be disturbed if it has any reasonable basis in law. This court has also made it clear that its review of a decision of the Board of Tax Appeals is limited to the grounds specified in § 271.10.[1]

It is clear from the record that relator bases its right of review on the proposition that the 1956 assessment should be set aside on the

---

[1]See, Village of Aurora v. Commr. of Taxation, 217 Minn. 64, 14 N. W. (2d) 292; Stronge & Lightner Co. v. Commr. of Taxation, 228 Minn. 182, 36 N. W. (2d) 800; Duluth-Superior Dredging Co. v. Commr. of Taxation, 217 Minn. 346, 14 N. W. (2d) 439; State ex rel. Inter-State Iron Co. v. Armson, 166 Minn. 230, 207 N. W. 727; Miller v. Commr. of Taxation, 240 Minn. 18, 59 N. W. (2d) 925; Western Auto Supply Co. v. Commr. of Taxation, 245 Minn. 346, 71 N. W. (2d) 797; Oliver Iron Min. Co. v. Commr. of Taxation, 247 Minn. 6, 76 N. W. (2d) 107.

grounds of either mistake or fraud in its making. This poses a distinct problem in the light of the fact that nowhere in the record is there testimony to the effect that when the assistant assessor, Arthur S. Nash, made the assessment his determination was affected in the slightest by any irregularity. Nor is there anything in the record to indicate that when Nash made the assessment the city manager of the city had any part in it. Nash died shortly after making the assessment. Whatever irregularity relator alleges to have occurred is limited to some date in March 1957. Peterson, who became the assessor in February 1956, did not personally view and appraise relator's property but adopted Nash's computations and they became for all purposes his assessment. Peterson testified that no mistake was involved in the assessment and that when relator sought to find out the reason for the increased assessment the so-called mistakes were contrived at the instigation of the city manager. Peterson by his testimony made it clear that at the time the assessment was made he knew that the warehouse was not in existence and that the actual area of the loading dock was not 56,000 square feet. The commissioner of taxation and the school district both claim that whatever relator may or may not have shown with respect to the circumstances surrounding the application for reduction, it has not shown that mistake or fraud occurred in the original assessment.

This presents the question: When is an assessment completed? In Eide v. Clarke, 57 Minn. 397, 401, 59 N. W. 484, this court, when confronted with that issue, said:

"The question now before the court is, at what stage of the tax proceedings are the lands assessed, within the meaning of the above provision? The appellant claims that they are not assessed until the different equalization boards have passed on the property lists and values, and the taxes are actually apportioned and levied; and that, as the new tax proceedings had not yet reached that stage, the lands were still assessed in the name of Merrick, and the redemption notices were properly addressed to him. We are not of that opinion. The word 'assessed' has several meanings, and there is a difference according to the language of the statute between assessing the lands

and assessing the taxes. We are of the opinion that the lands 'are assessed,' for the purposes of this notice, when the assessor returns the assessment book, properly filled out, to the county auditor, as provided in section 41; and the name of the person then stated in the assessment book as owner of a parcel of land is the person in whose name the land is then assessed. * * * The lands are assessed as soon as the books are returned by the assessor to the county auditor, though the taxes are not yet assessed."

In B. W. & Leo Harris Co. v. Dakota County, 246 Minn. 20, 25, 74 N. W. (2d) 111, 114, this court said:

"In our opinion the legislature clearly intended that 'assessment' mean the act of carrying out the duties of the assessor as defined in § 273.071, subd. 14, and § 273.08. In other words, 'assessment' is the process of going forward from the time the property is listed; of viewing property, determining its true and full value, entering that value on the book opposite the description, entering the assessment in the assessment book and on the tabular statements for each book in correct balance."

The record establishes that all phases of the assessment procedure had been completed many months prior to March 1957, when Frizzell suggested that Peterson attempt to effect a lowering of the assessment by pretense that mistakes had been made with reference to the loading dock and warehouse. That the letter written to carry out the city manager's plan was sent to the county auditor nine months after the original assessment had been completed and forwarded to him is conclusively shown by the uncontradicted testimony of Peterson, who gave as the reason for his unusual actions the fact that the 1956 assessments had previously been forwarded to the county auditor. Relator in effect admits that any connivance and fraud perpetrated by Frizzell and Peterson were no part of the assessment by the statement in its brief that the instructions Peterson stated he was carrying out, if in fact made, are properly no part of the assessment procedure.

The burden of proof rests upon the party asserting that his property has been inequitably assessed. In In re Petition of Hamm v. State,

255 Minn. 64, 95 N. W. (2d) 649, a proceeding in district court to obtain reduction of an assessment, we said that absolute equality is impracticable of attainment and the taxpayer may not complain unless the inequality is substantial, and that while good faith alone does not justify an assessment that is discriminatory in fact, nevertheless, the good faith of tax assessment officers and the validity of their actions are presumed and the burden of proof of overcoming such presumption rests upon the complaining party.

In another proceeding to obtain reduction of an assessment, Schleiff v. County of Freeborn, 231 Minn. 389, 395, 43 N. W. (2d) 265, 269, this court observed:

"Two well-established principles must form the basis of our decision. They are (1) that the assessor's valuation is prima facie valid, the burden resting upon the taxpayer to prove that it is excessive (In re Taxes of Potlach Timber Co. 160 Minn. 209, 199 N. W. 968); and (2) that if the assessor's valuation be upset, nevertheless the court's findings on value must be sustained unless they are manifestly contrary to other evidence submitted on this issue. State v. Penn Mut. L. Ins. Co. 198 Minn. 115, 269 N. W. 37. In other words, even though it appears that the assessor did not follow the statutory mandates in arriving at the estimates of value, the trial court's findings on the issue of value must be sustained if there is other evidence to support them."

Since a taxpayer alleging mistake, fraud, or other irregularity in the assessment of his lands and property must show that the assessment is discriminatory or excessive or that the alleged wrongful act, if any, has in some way caused financial injury to him, relator had the burden of proving by a preponderance of the evidence that the mistake or fraud it alleged has occurred and that it has been damaged thereby. However, relator called no witnesses to show that the assessment was excessive or to show valuations of other similar properties in the area. In effect, its witnesses disassociated themselves from competence to testify to the value of relator's properties. Nor did they give any testimony to establish that the assessment as originally made had imposed a burden of unequal taxation as between relator's properties and other properties similarly used and similarly located. Upon

the record it is clear that the burden which is on relator to show by plain and convincing evidence that there has been an overvaluation in the assessment has not been met.

We think respondents have quite adequately shown that there was no overvaluation of relator's properties. The testimony of the appraisers stands unchallenged in that respect. In addition, evidence of the amount for which relator had insured its properties—without coinsurance—at the time of the assessment was introduced as tending to show relator's view of their value. That evidence standing alone is not conclusive but when coupled with other probative evidence goes a long way to establish the propriety of the assessment. As stated, relator failed to overcome respondents' evidence by evidence of a like character.

Relator argues that when an assessment is based on mistake or fraud, a taxpayer is not charged with the burden to go forward and show that there has been an overvaluation. This contention is without merit. Moreover, its basis is an assumption which has no foundation in fact since no evidence of any kind was introduced to establish fraud or mistake in the initial assessment procedure. The attempt by the assessor and the city manager to establish an overvaluation months after it had been completed has no connection with the assessment.

2. The real issue before us is whether the decision of the Board of Tax Appeals finds justification in the evidence. This court has never and cannot now lay down any definite rule that will apply to all cases where similar appeals are taken and reviews follow by this court. The facts must in all cases of this nature be more or less determinative. It is apparent from the record that the Board of Tax Appeals gave all of the testimony submitted thorough consideration. Under the circumstances we are not permitted to substitute our judgment on the facts for that of the board. It is the trier of fact in cases of this nature that determines the probative value of the testimony. That is its prerogative and not ours, subject to interference by this court only if its action was arbitrary, oppressive, or unreasonable, and represented its will and not its judgment. In other words, our jurisdiction in reviewing fact questions is limited to determining whether

there is reasonable evidence to sustain the findings. The board was required on hearing de novo to apply and use its independent judgment in its evaluation of all the testimony determinative of the issues before it. The controlling issues in the instant case were fact issues. The evidence was such that the board's order finds affirmative support in the record. Under the circumstances we cannot say that the findings and decision of the board do not have support in the evidence. Oliver Iron Min. Co. v. Commr. of Taxation, 247 Minn. 6, 76 N. W. (2d) 107.

We therefore conclude that the evidence reasonably sustains the findings and decision of the Board of Tax Appeals.

Affirmed.

MR. JUSTICE ROGOSHESKE, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.