**CHISAGO HEALTH SERVICES, Relator,**

v.

**COMMISSIONER OF REVENUE, et al., Respondents.**

No. C2–90–793.

Supreme Court of Minnesota.

Nov. 2, 1990.

John W. Windhorst, Jr., Mary J. Streitz, William R. Goetz, Dorsey & Whitney, Minneapolis, for relator.

Hubert H. Humphrey, III, Atty. Gen., Thomas R. Muck, James W. Neher, Office of the Atty. Gen., Tax Litigation Div., St. Paul, for respondents.

SIMONETT, Justice.

Petitioner's claim that its auxiliary facilities were entitled to a property tax exemption, either as a "public hospital" or as a "purely public charity," was denied by the Tax Court. We affirm the Tax Court.

As the result of studies commissioned over a period of years by the Chisago Lakes Hospital District and the Chisago Lakes Medical Center, P.A., the two entities reorganized. This reorganization is believed to be the first merger of its kind of a rural public hospital and a practicing group of physicians and was accomplished in the following manner.

A new corporation was formed in 1986, named the Chisago Health Services (CHS), the petitioner in this case. CHS assumed the operation of the Chisago Lakes Hospital (hereinafter the Hospital), formerly operated by its owner, the hospital district. It also took over the operation of the Hospital Annex, an addition to the Hospital which includes an outpatient medical clinic, sometimes called an ambulatory care facility. CHS also took over operation of two ambulatory care facilities in the neighboring small towns of North Branch and Wyoming. In this proceeding, petitioner claims that the Wyoming facility and the Hospital Annex are entitled to a property tax exemption.

Under the reorganization, the employees of the hospital district have become employees of CHS. The doctors' professional corporation transferred its medical practice and leasehold interest in the Hospital Annex to CHS, and its physicians and other employees are now also full-time employees of CHS.

The Wyoming clinic building, newly built by the District, is about 7 miles from the Hospital. Aside from space devoted to mechanical operations, about 19 percent of the space is used for physical therapy, 53 percent for patient examination rooms, and 28 percent for a waiting room, reception area and hallways for all patients of the facility.

In the Hospital Annex, aside from area devoted to mechanical operations, about 32 percent of the space is used as a business office serving all the facilities operated by CHS; approximately 51 percent is used by the physicians for their offices, examination rooms, and a waiting room.[1]

The Hospital consists of a 49–bed acute care facility and an attached 40–bed skilled nursing care facility. Unquestionably, the Hospital is exempt from property taxes as a "public hospital." Some of the ambulatory care services formerly performed only at the Hospital are now performed at the Hospital Annex and the neighboring ambulatory care facilities.

Since CHS has commenced operations, the number of employee-physicians has grown from 11 to 14. These physicians staff the ambulatory care service in the Hospital Annex, as well as at the Wyoming (and North Branch) facilities. The doctors are supervised by CHS, and CHS does all the billing and collections. Only employee-physicians on the active staff of the Hospital may admit patients to the Hospital. Physicians who are neither active staff nor consulting staff (there are some 25 consultant physicians) are not permitted to admit patients to the Hospital. Active staff physicians may not admit patients to hospitals other than the CHS Hospital.

The employee-physicians are paid in accordance with a salary scale set by a CHS committee which does not include the physicians. Physician compensation is de-

---

1. The remaining 15 percent of the Annex is rented to dentists. No exemption is claimed for this space.

Neither, we should add, does CHS claim an exemption for its ambulatory care facility at North Branch, apparently because the facility is leased from a non-exempt owner.

signed to take into consideration: (1) tenure; (2) productivity measured by services generated; and (3) market compensation for physicians practicing in similar specialty areas.

All CHS facilities have an open door policy, *i.e.*, patients may receive care even if they are unable to pay for it. This policy appears in the patient information packets. In practice, most patients do not discuss their finances prior to admission. Rather, the patients receive the usual billing. CHS then follows its customary collection process for unpaid bills; if CHS determines during its collection efforts that a patient lacks ability to pay, any unpaid balance is written off. From June 1, 1986, to August 31, 1988, CHS has recorded close to $1 million in bad debts, more than half attributable to the ambulatory care facilities. Actual write-offs during this period were $190,492. All Minnesota nonprofit hospitals have a similar open door policy. Most private medical clinics do not. The Chisago Lakes Medical Center, P.A., did not have such a policy.

The reorganization came about because of radical changes in the nature and delivery of health care, changes which have particularly affected rural hospitals. Ninety percent of area households in the Chisago Lakes Hospital District were using Twin Cities health care facilities. Area residents and the physicians lacked confidence in their local Hospital, and the physicians saw their relationship with the Hospital as adversarial. The Hospital saw a three-fold need: to have a better working relationship with the doctors; to promote its market by taking advantage of the extraordinary population growth (unusual perhaps for a rural area) along the Highway 35E corridor; and to improve its outpatient services.

The District was aware, too, of radical changes in health care economics. Government payments for Medicare and Medicaid patients, a large part of a small hospital's revenue, were, respectively, about 15 to 40 percent below the Hospital's charges to private paying patients. Health insurers were stressing efforts to keep people out of hospitals and aggressively seeking to negotiate discounts for hospital services. In 1987, 56.7 percent of CHS' revenue came from Medicare, Medicaid, and Health Maintenance Organizations (HMO's); this figure was projected to be 66.8 percent in 1988. Revenue from self-paying patients was 12.3 percent in 1987 and was expected to decline to 9.5 percent in 1988.

From 1982 through 1986, the average length of stay in the Hospital had declined by 41 percent, the number of admissions had declined by 20 percent, and the total number of hospital patient days had dropped by 52 percent. Yet, from 1982 to the time of the trial, outpatient revenue grew from 15 to 45 percent of total revenues. Similar increases were occurring in hospitals throughout the state.

The reorganization was designed to ensure unified planning with physician involvement, to offer better quality and cost control, and to encourage the physicians to develop specialty programs for the Hospital. The new program, too, would help reduce the risk of competition from Twin Cities clinics and physicians, while at the same time enabling the District to do a better job of providing an integrated health care program to the communities it served.

The foregoing facts were found by the Tax Court and are not disputed. More facts will be added during our discussion of the issues.

## I.

The first issue is whether the Hospital Annex and the Wyoming ambulatory care facility qualify for a property tax exemption as "public hospitals." Minn. Const. art. 10, § 1 and Minn.Stat. § 272.02, subd. 1(3) (1990).

◼ Preliminarily, we note this exemption is not limited to buildings actually used as hospitals. It applies to any property "devoted to and reasonably necessary for the accomplishment of" public hospital purposes. *State v. Fairview Hospital Ass'n*, 262 Minn. 184, 187, 114 N.W.2d 568, 571 (1962). The auxiliary property need not be "essential" or "indispensable" to the accomplishment of an exempt purpose; nor

must it necessarily be adjacent or close to the public hospital itself. *Id.* at 187, 114 N.W.2d at 571. The term "necessity" is to be given a "reasonable, natural, and practical interpretation in the light of modern conditions." *Abbott–Northwestern Hospital, Inc. v. County of Hennepin,* 389 N.W.2d 916, 919 (Minn.1986), *quoting Community Hospital Linen Services, Inc. v. Commissioner of Taxation,* 309 Minn. 447, 452, 245 N.W.2d 190, 193 (1976).

■ In this case the Tax Court concluded that the Wyoming outpatient facility and the Hospital Annex were not reasonably necessary to accomplish the purpose of a public hospital. We "will not disturb a decision of the tax court if the evidence is such that the tax court could reasonably reach the conclusion that it did." *City of Springfield v. Commissioner of Revenue,* 380 N.W.2d 802, 805 (Minn.1986), *citing Red Owl Stores v. Commissioner of Taxation,* 264 Minn. 1, 5, 117 N.W.2d 401, 405 (1962).

The parties disagree on what the "reasonably necessary" test means. The petitioner contends the test is met if the evidence establishes that the auxiliary facilities are reasonably necessary to continue to operate the Chisago Lakes Hospital in "a financially sound manner." In other words, according to CHS, "reasonably necessary" may mean reasonable economic necessity. The Commissioner, on the other hand, says the test is not of economic health or viability; rather, the Commissioner contends, the question is whether the auxiliary property must be reasonably necessary to the *functional operation* of the Hospital.

Both parties look for guidance to our two most recent cases on this subject. In *City of Springfield, supra,* we held certain auxiliary facilities not exempt, while in *Abbott–Northwestern, supra,* we held certain other auxiliary facilities to be exempt. A brief survey of these two cases is instructive.

In *City of Springfield,* a small rural municipality owned and operated a municipal medical clinic adjacent to its municipal hospital, which it had built to attract doctors. The business affairs of the clinic were handled by the hospital. The physicians in the clinic were paid 60 percent of their gross accounts receivable, while the hospital retained 40 percent. The Tax Court found that (1) the clinic was not devoted entirely to a public purpose because the physicians were really carrying on a private practice in the clinic building on a basis similar to the fee basis of other doctors; and (2) the clinic property was not reasonably devoted to the accomplishment of the hospital's purposes. We concluded that the Tax Court's findings were not clearly erroneous and affirmed.

Important for our purposes, the city in *Springfield* argued that the medical clinic was essential for the hospital's existence because it generated patients for the hospital and because the clinic was operated and managed by the hospital as though it were an extension of the hospital. *Id.* at 805. Significantly, we rejected both arguments. In other words, we rejected a "reasonably necessary" test based predominantly on economic necessity.

In *Abbott–Northwestern,* the Tax Court determined that a lodging facility, part of a hospital complex used for preadmission patients, outpatients, and families of patients, was exempt from property taxes. We affirmed. There was evidence that hospital treatment included having family members attend the inpatient. Consequently, we said, the Tax Court might find that the lodging facility "was reasonably necessary in this modern age for the accomplishment of its purpose of furnishing health care services to patients." 389 N.W.2d at 919. In other words, we applied the reasonably necessary test in a functional sense. *See also State v. Fairview Hospital Ass'n, supra* (recreational lake property used by nursing students exempt because "well within the concept of its [the nursing school's] normal operations" designed to train nurses for the parent hospital).

We agree with the Tax Court that this case is much closer to *Springfield* than to *Abbott–Northwestern*. It may well be—indeed, the Tax Court found—that the auxiliary facilities and the creation of CHS were a necessary part of a plan to maintain and increase the patient base and revenues of the hospital, to build its market, and generally to do a better job of providing an integrated health care program in its service area. Nevertheless, the Tax Court also found that the CHS health care system was "not so fully integrated" as to meet the reasonably necessary test. Neither, noted the Tax Court, were the ambulatory care facilities as fully integrated as in *St. Elizabeth Hospital, Inc. v. City of Appleton*, 141 Wis.2d 787, 416 N.W.2d 620, 621 (App.1987); there the hospital provided "walk-in medical care services in its emergency room facility, under the licensed trade name 'First Care.'"

■ Auxiliary facilities to qualify for tax exemption must, first of all, be devoted to what it is that a public hospital does and, secondly, be reasonably necessary to accomplish that purpose. The test, in a sense, measures the degree to which the auxiliary facilities and the public hospital are functionally interdependent.

■ Here, as in *Springfield*, the District has devised a plan to attract physicians and patients to its Hospital and to remain competitive with neighboring health care providers; but, as in *Springfield*, this purpose, though it makes good economic sense, does little to advance a tax exemption. Petitioner seeks to distinguish *Springfield* on the grounds the physicians in that case received a fixed percentage of gross accounts while the CHS physicians are on a fixed salary. This distinction loses much of its force, however, because, as the Tax Court points out, the CHS physicians'

salaries take into account an individual doctor's productivity measured by the services he or she generates. In other words, there is a substantial nonpublic aspect to the way in which the physicians practice in the medical clinic facilities.

The Tax Court found that an assured increase of inpatients, while desirable, was not necessary for the Hospital to function as a hospital;[2] that the CHS rule requiring its employee-doctors to admit all their patients to the Hospital was a self-imposed requirement, not a functional need; and while the ambulatory care facilities furnished some of the same services offered by the Hospital, this was done "for the purpose of maximizing geographic localities to generate revenue." Finally, the Tax Court was not persuaded that the merger of the Hospital and the physicians group was reasonably necessary to remedy the Hospital's lack of equipment and to cure the adversarial relationship existing between the Hospital and the outpatient clinics; both of these problems could be resolved by measures other than merger.

CHS claims also that the Tax Court and the Commissioner erred in treating the Hospital as only an inpatient facility for purposes of the reasonably necessary test. This argument, of course, questions exactly what it is that hospitals do, and the question arises at a time when the old distinctions between hospitals and doctors' clinics are being blurred and their respective services tend somewhat to overlap. But even in view of these changing circumstances, we cannot say that the Tax Court erred in treating the CHS reorganization as primarily one to enhance the Hospital's economic viability, not its functional purpose.

The difficulty with granting tax exemption to auxiliary properties which help an exempt institution to survive or to prosper financially is two-fold. First, it is difficult to know where to draw the line; almost any auxiliary facility can be found to im-

---

2. *Compare Mayo Foundation v. Commissioner of Revenue*, 306 Minn. 25, 38, 236 N.W.2d 767, 774 (1975), where the need for a large patient base was found to be functionally necessary to the charitable entities, the court stating: "The quality of a clinical education program depends, to a large extent, on the availability of a large and diverse patient population to provide exposure to various medical problems and situations. Similarly, the Mayo research program depends on a large patient population in order to function successfully."

prove the financial well-being of a hospital. Secondly, these exemptions, because they are exceptions to the requirement of uniform taxation, tend to give an unfair competitive advantage to the exempted facility over similar facilities privately operated.

Moreover, if economic well-being were to be the test, the court would be required to weigh the competing economic interests of the currently volatile health care marketplace, thus placing the court in the position of legislating tax relief. Recently, in being asked to evaluate the new HMO's in this same context of tax exemption, we said, "[T]he legislature, with its ability to explore all issues with respect to these health care facilities, is the appropriate body to make such a determination." *Share v. Commissioner of Revenue*, 363 N.W.2d 47, 53 (Minn.1985).

In any event, our role is a limited one. We review the record and the findings and conclusions of the Tax Court not to make our own decision on the merits, but to determine "if the evidence is such that the tax court could reasonably reach the conclusion that it did." *Springfield*, 380 N.W.2d at 805. We believe the Tax Court's understanding of the reasonably necessary test was correct and that it could reach the decision it did. The Tax Court's denial of an exemption as a public hospital is affirmed.

## II.

The second issue is whether the auxiliary property is exempt as included within "institutions of purely public charity." Minn. Const. art. 10, § 1; Minn.Stat. § 272.02, subd. 1(6). We think not.

In *North Star Research Institute v. County of Hennepin*, 306 Minn. 1, 6, 236 N.W.2d 754, 757 (1975), we listed six factors bearing on whether a facility qualifies as a purely public charity. Three of these factors (the first, fourth, and sixth) are admittedly met here, namely: (a) the stated purpose of CHS is charitable; (b) income received and produced does not produce a profit; and (c) upon dissolution, the assets go to the Chisago Lakes Hospital District.

■ The second *North Star* factor considers the extent to which the entity is supported by donations and gifts. CHS argues that Medicare and Medicaid payments, comprising 26 percent of its revenue, should be counted as donations. We have allowed certain government subsidies in the area of public housing to qualify as donations. *See Rio Vista Non–Profit Housing Corp. v. Ramsey County*, 277 N.W.2d 187, 190 (Minn.1979) (federal construction loan and rent subsidies, to which "the very existence of Rio Vista can be attributed"); *In re Claim of Assembly Homes, Inc. v. Yellow Medicine County*, 273 Minn. 197, 140 N.W.2d 336 (1966) (care for nursing home patients paid by county welfare or veteran benefits). We do not think the *Rio Vista* rationale should be extended to apply here. It seems to us, as it did to the Tax Court, the government's payments under the Medicare and Medicaid programs are more accurately characterized as payments for services rendered, not as donations.

■ The third *North Star* factor examines whether the "charity" recipients are required to pay for the assistance they receive. CHS contends it provides services to many patients at reduced rates or without charge, and it also points to its open door policy, as well as its volunteer and outreach programs. The fact that CHS discounts its market fees in accepting Medicare and Medicaid payments does not, by itself, constitute the extension of charity to the patients involved. As the Tax Court noted, there is little conceptual difference between these discounts and the business discounts negotiated by HMO's and health insurers on behalf of their insureds with both public and private clinics and hospitals. As to the open door policy, the Tax Court found it did benefit a relatively small number of patients, but that, in practice and on the whole, the open door policy was no more than writing off uncollectible bills, a business practice not unlike that of other health care providers. Moreover, the community outreach programs nowhere came near the medical research and education

programs of the Mayo facilities. *See* footnote 2, *supra.*

■ Finally, the fifth *North Star* factor asks whether the beneficiaries of the "charity" are restricted and, if so, if the restricted class bears a reasonable relationship to the entity's charitable objectives. The restricted class, in this case, would be those patients of the medical clinics at the Hospital Annex and at Wyoming who are financially unable to pay. The Tax Court found that the CHS medical clinics were operated in essentially the same manner as any private medical clinic, *i.e.*, furnishing outpatient services at market level fees. In other words, CHS' operation of its medical clinic facilities did not really lessen the burden of government in the overall field of health care. *See Chateau Community Housing v. Hennepin County,* 452 N.W.2d 240; 244 (Minn.1990).

Consequently, the evidence supports the Tax Court's decision that the auxiliary properties do not qualify as a purely public charity, and we must affirm that decision.

It would seem that some portion of the Hospital Annex, that portion which serves as the central administration center, would qualify as reasonably necessary to accomplishment of the Hospital's purposes. The Tax Court so noted, but indicated that at least for now the record does not identify that space.

Affirmed.

YETKA, Justice (dissenting).

I respectfully dissent from the majority holding. It is my opinion that the Hospital Annex and Wyoming facilities which are detached from the main hospital building in Chisago City ought to be exempt from property taxation. The Commissioner of Taxation ruled that they are not.

The health care system in America has undergone dramatic change within the past decade. Medicare and Medicaid have systematically reduced their payments to hospitals for patient services. Third-party payors—HMO's and private insurers—have imposed restrictions on reimbursement. As a result, hospital revenues have dropped drastically. In order to survive, hospitals have had to look for alternative, more cost-effective ways to provide patient service. Many have set up outpatient and ambulatory care facilities, often in shopping malls and neighborhood centers remote from the hospital inpatient unit.

Small rural hospitals especially have suffered in the new environment. They lack a large patient base and opportunities for growth. They have fewer sources of patient revenue and charitable donations than large institutions. Moreover, they face fierce competition from large metropolitan hospitals that seek to expand their own patient base in these difficult times.

The hospital in Chisago City, like other small rural hospitals, was in financial trouble. Hospital occupancy was dropping rapidly. Admissions were down. Average length of stay was declining. There were several doctor clinics in the area, but the doctors were referring patients to the Twin Cities, Forest Lake, or elsewhere because the hospital facilities were not adequate.

In response to these problems, the hospital district and the doctors formed a non-profit corporation, Chisago Health Services (CHS). CHS took over both the clinics and the hospital and operated them for non-profit purposes. The doctors became employees of CHS. Non-doctor members of the CHS Board of Directors set the doctors' salaries annually. The new corporation is non-profit, so there are no profits to distribute to the doctors, and their sole remuneration is their salaries. The detached facilities at Wyoming and the Hospital Annex, formerly private clinics, now are organized as ambulatory care centers. They perform outpatient surgery, physical therapy, and other outpatient services which modern full-service hospitals provide.

The commissioner held that, while the main hospital in Chisago City is exempt from property taxes as a public hospital, the facilities at Wyoming and the Hospital Annex are not exempt. It seems to me that these facilities qualify for tax exemption as "reasonably necessary for the accomplishment of [the hospital's] purposes."

*Abbott–Northwestern Hosp., Inc. v. County of Hennepin,* 389 N.W.2d 916, 919 (Minn.1986).

The form of providing hospital services is changing. Today many hospitals have only a 10 or 20 percent occupancy rate compared to 30 years ago when 90 to 100 percent of inpatient beds were filled. Today Medicare, Medicaid, and private insurers demand that patient care be delivered in a more cost-effective way, that is, on an outpatient basis. Today hospitals derive their revenues more from short-term patients and those who receive ambulatory care than from long-term inpatients. It is reasonable for a hospital to enlarge its outpatient service and to provide care in remote locations which are more accessible to walk-in patients.

Within the spectrum of hospital services, even under the traditional inpatient model, there have always been services that operated at a loss. Other services broke even. Some brought in revenue, and they offset the losses from those services which a community hospital must offer to its public even if it loses money on them. There have always been hospital-based employee physicians staffing the laboratory, radiology, anesthesia and other departments. There have always been outpatient care programs, most visibly in emergency departments. CHS has brought together elements which, if placed under the roof of the main hospital building, would undisputably be tax exempt. It appears to me that they are challenged because they are physically separated from the main hospital.

CHS was formed in order to meet the needs of a changing health care environment and to attract more doctors. Before CHS was organized, there were 11 doctors in the area; now, 14 doctors serve the area as CHS employees. The number of patients has increased and so have revenues. Under its new structure, CHS is financially viable and may survive to serve this rural community. In this light, the two ambulatory care facilities may be more than "reasonably necessary" to accomplish the hospital's purposes; they may be essential to this hospital's survival.

I believe, therefore, that relator has met the test required by the legislature; thus, I dissent.

WAHL, Justice (dissenting).

I join the dissent of Justice Yetka.