The EVANGELICAL LUTHERAN GOOD SAMARITAN SOCIETY, Appellant,

v.

BOARD OF REVIEW OF FAYETTE COUNTY, Iowa and Lawrence Cannon, Chairman, Appellees.

No. 2–59915.

Court of Appeals of Iowa.

April 28, 1978.

Eugene T. Hackler and Robert C. Londerholm, of Hackler, Londerholm, Speer, Vader & Austin, Olathe, Kan., and James E. Thomson, of Jacobson, Bristol, Thomson & Bauercamper, Waukon, for appellant.

Walter L. Saur, Oelwein, for appellees.

Heard by ALLBEE, C. J., and DONIELSON, SNELL, OXBERGER and CARTER, JJ.

ALLBEE, Chief Judge.

This appeal is from denial of property tax exemptions. The question is whether the Evangelical Lutheran Good Samaritan Society has proven itself to be a charitable and benevolent society using its nursing home in West Union solely for appropriate objects

without a view to pecuniary profit.[1] Section 427.1(9), The Code. The tax years in issue are 1973 and 1974.

The plaintiff society is a North Dakota nonprofit corporation and is authorized to do business in Iowa.[2] It follows a policy of placing health-care facilities in communities which invite them and assist in providing the means to establish such facilities. Such was the case in West Union, where $40,000 raised by the community, and a farm, were donated to the society.[3] The society's West Union property had always been held tax-exempt until March 27, 1973 when the county assessor denied the exemption. This denial was upheld by the board of review and by the district court.

The principles which govern this case were most recently recited in *Iowa Methodist Hospital v. Board of Review,* 252 N.W.2d 390, 391–92 (Iowa 1977). Review is de novo. Tax exemption statutes are strictly construed, with any doubt resolved in favor of taxation. Plaintiffs have the burden to show that the property should not be taxed. Recent decisions endorse a tightening of exemptions. *Dow City Senior Citizens Housing, Inc. v. Board of Review,* 230 N.W.2d 497, 499 (Iowa 1975). Because each case must be decided on its own facts, *Dow City, supra,* any previous decision involving plaintiff, specifically *Evangelical Lutheran Good Samaritan Society v. Board of Review,* 200 N.W.2d 509 (Iowa 1972), is of no present significance beyond being authority for the general principles involved. *Cf. Iowa Methodist Hospital v. Board of Review,* 252 N.W.2d at 391.

Our first inquiry must be whether the West Union home is being used for a charitable purpose. *South Iowa Methodist Homes, Inc. v. Board of Review,* 173 N.W.2d 526, 532 (Iowa 1970) stands for the proposition that the gratuitous or partly gratuitous care of elderly persons is a charitable purpose. *See also Evangelical Lutheran Good Samaritan Society v. Board of County Comm'rs.,* 219 N.W.2d 900, 906 (N.D.1974). It is clear that this was the purpose of the plaintiff society. More important, however, is the actual use of the West Union property. *South Iowa Methodist Homes,* 173 N.W.2d at 532. It is also apparent that the property is being used for the care of elderly people; the average age at the West Union home is 83.[4] Thus the first fighting point is whether such services were provided gratuitously or partly gratuitously.

Resolution of this point must be postponed briefly, however, because it depends in part on whether we determine that exhibit 64 should be considered. Exhibit 64 is a list of individuals cared for in the West Union home at a reduced cost during 1972; it shows the actual payments received, the standard cost, and the difference between the two. In substance it is identical to exhibit 66. Defendant objected to admission of exhibit 64 on the basis that what occurred in 1972 had no relevance to tax exemptions for 1973 and 1974. Trial court agreed with defendant, but allowed an offer of proof. *Cf. In re Scarlett,* 231 N.W.2d 8, 10 (Iowa 1975); *Leo v. Leo,* 213 N.W.2d 495, 498 (Iowa 1973). Exhibit 64 is relevant to the issues in this appeal. The supreme

1. No consideration is given to whether plaintiff is a religious society; it does not, however, appear to be either legally or financially controlled by any church body.

2. The society is exempt from federal income tax under I.R.C. § 501(c)(3).

3. These figures pertain to the opening of the nursing home in 1966. A custodial home was also located in downtown West Union; that home was closed in 1973 because it became outdated.

4. It is in this respect that the instant case is different from *Dow City Senior Citizens Housing, Inc. v. Board of Review,* 230 N.W.2d 497, 499 (Iowa 1975), where it was observed that "[p]laintiff provides no care; it provides housing." By contrast, the West Union home's array of personal services to its residents includes the giving of shots, the taking of pulse, temperature and blood pressure, providing both bed and partial baths, special diets, bowel and bladder training programs which include complete colostomy and catheter care, the dispensing of medication, providing physical therapy and care for dressings and decubitus ulcers. Also, some residents are nonambulatory.

court appears to have considered matters which occurred over a period of time outside the tax year in question in *South Iowa Methodist Homes,* 173 N.W.2d at 528–30. Further, the actions taken by the county assessor and the board of review in the present case occurred early in 1973. Their actions must necessarily have been taken on the basis of information about activities carried on in years immediately previous. Exhibit 64 is, therefore, admissible.

Exhibit 64 demonstrates that plaintiff's services to the elderly of Fayette County have, when necessary, been provided at reduced cost.[5] That this is not a rare occurrence is illustrated by the high percentage of residents which exhibit 64 shows as being maintained in both the nursing home and the custodial center on a partly gratuitous basis. Douglas Peterson, the West Union facility's administrator, testified that other individuals who were unable to pay full price were being served at the time of trial. Plaintiff also produced evidence of a policy which requires admission of persons despite inability to pay for their care.[6] Local administrators are empowered to admit such persons without consulting the central administration. There is no basis in the record for defendant's suggestion that local administrators may enforce a more rigid admission policy. Nor is there anything in the record which indicates that any person has been evicted from the West Union home for inability to pay.

■ It is apparent, therefore, that plaintiff meets the first requirement of § 427.-1(9), The Code. The record establishes that its charitable purposes were met: it provided gratuitous or partly gratuitous care for elderly persons. The society is a charitable one, using the West Union facility solely for its appropriate objects.

5. Exhibit 64 reveals that in 1972 charges for residents of the nursing home were reduced by a total of $19,374.14. Reductions in charges for residents of the custodial center cumulated to $3659.80. Total reductions for that year amounted to $23,033.94.

6. Herein lies another significant difference between this case and *Dow City, supra.* In the latter case, the court noted "[plaintiff] does not

Moreover, plaintiff enjoys the benefits of a large number of hours of volunteer assistance from members of the local community (volunteers contributed 2000 hours during 1972, 1600 in 1973 and 2400 in 1974), *cf. South Iowa Methodist Homes,* 173 N.W.2d at 528, and receives donations from various sources. *Cf. Iowa Methodist Hospital,* 252 N.W.2d at 392. (Donations to the West Union facility, including initial gifts, totaled approximately $82,000.)

Our next inquiry, then, is whether the West Union facility was operated "with a view to pecuniary profit." It was not. An expert testified that a reasonable rate of return for a proprietary operation comparable to plaintiff's West Union home would be approximately 10%. For plaintiff's home, the rate of return was .1% in 1972, 6% in 1973 and 3.12% in 1974. The expert examined and explained the source of the society's equity growth, and of its surplus. He expressed the opinion that the West Union home was not being operated with a view to pecuniary profit.

The reasons for the existence of an excess of income over expenses for the home are apparent when an examination is made of the rather modest salaries paid to management personnel in the society and when the amount of volunteer labor is considered. For example, out of Douglas Peterson's salary as administrator for the society's operations in West Union, $265 per month was allocated to the nursing home. Replacement of the quality of life services provided by volunteers would require considerable amounts if such workers were reimbursed for their contributions. It is important to note, too, that the equity increase recorded each year is primarily the result of the society continuing to make required mort-

provide housing to those unable to pay its charges either personally or with third party help. Its charges are fixed at a level to make it self-sufficient. No concessions on rent are made to residents based on need." 230 N.W.2d at 499. Similarly, in *Iowa Methodist Hospital,* 252 N.W.2d at 392 the court pointed out the fact that the plaintiff there accepted no nursing home residents who were unable to pay.

gage payments. None of plaintiff's excess of income over expenses were ever distributed.[7] They were, instead, turned back into the charitable work of the society.

The view that the home was not being operated for profit finds further support in the society's plans for disposing of the West Union custodial center. August Hoeger, Jr., the society's executive director, testified that the physical plant was being donated to a local historical group. This donation by the society to a community is not an isolated occurrence. Hoeger testified that the society had given the Mason City community a home involving assets of approximately two and one-half million dollars, and had given up its interest in Allen Memorial Hospital in Waterloo, without compensation. A review of the full record indicates that the society as a whole, and the West Union facility specifically, is operated as a means of serving the elderly of the community without regard to pecuniary profit.[8]

Finally, defendant refers to the language of *Dow City Senior Citizens Housing, Inc. v. Board of Review,* 230 N.W.2d at 499, where the court concerns itself with the question of whether the benefits bestowed by the institution claiming exemption justify the increased burden on the local taxpayers. They argue that the society takes excess funds from West Union to distribute over the rest of its operations. This contention is without factual basis. The record contains affirmative evidence that such excess funds, if any, are used to benefit the local community, through local capital improvements or expansion of local facilities. An example of this is found in the 20-bed addition to the West Union home. Funds which leave the community go to the society's central office for services which are essential to the continued operation of each individual home. There was also testimony that a facility with excess funds might make a loan to another facility. Such loans do not result in the lender supporting the borrower in any manner; they are repaid with interest.

 We have evaluated the overall operation of the society's West Union facility and find it is maintained to care for the physical and mental well-being of its aged residents; it renders gratuitous and partly gratuitous services; it has assumed burdens which otherwise might become those of the state. There is, in addition, emphasis on religious ideals and spiritual needs. The society operates efficiently through sound organization and management; this is enhanced by community contributions of time and money. Its objects are charitable. To require that the society sustain operating deficits in order to perpetuate its real estate tax exemption is unsound and would discourage responsible management practices.

All claims by both parties have been considered. Our resolution of the issues discussed makes consideration of other questions raised unnecessary. Upon remand, trial court shall enter a decree sustaining plaintiff's claim to tax exemptions.

REVERSED AND REMANDED.

---

**7.** Board members serve without compensation. The society's chief administrative officer, August Hoeger, Jr., was paid $19,600 in 1975 and received the use of a home.

**8.** Evidence indicated that plaintiff's home receives from the Iowa Department of Social Services a higher daily reimbursement for its welfare residents than do the two local proprietary homes. The plaintiff's home receives $14.40 per day, while the Grandview Nursing Home receives $13.22 and the Roberts Nursing Home receives $13.38. The significance of these figures is diminished by the fact that no showing has been made as to what services the proprietary homes provide, or the extent of those services. In contrast, plaintiff showed quite an impressive scheme of services for its residents, as summarized above in footnote 4.