**VAN BUREN COUNTY HOSPITAL AND CLINICS, Appellant,**

v.

**BOARD OF REVIEW OF VAN BUREN COUNTY,**
**Appellee.**

No. 00–1535.

Supreme Court of Iowa.

Sept. 5, 2002.

Mark R. Schuling of Brick, Gentry, Bowers, Swartz, Stoltze, Schuling & Levis, P.C., Des Moines, for appellant.

Frank W. Pechacek, Jr. and Michael J. Davenport of Willson & Pechacek, P.L.C., Council Bluffs, for appellee.

J. Kirk Norris, Des Moines, for amicus curiae Iowa Hospital Association.

CADY, Justice.

This appeal requires us to determine whether portions of a county hospital used as a medical clinic for physicians and a clinic for specialists, as well as portions of the hospital property used to provide employment placement services and agricultural health and safety instructional courses, were entitled to an exemption from property taxation pursuant to Iowa Code section 427.1 (1997). The Board of Review of Van Buren County (Board) denied the county hospital's claim for exemption. The Board found the portion of the property in dispute was not devoted to a public or charitable use and was operated with a view to realizing a pecuniary profit. The district court affirmed the Board's decision on judicial review. On our review, we conclude the property was exempt from taxation. We reverse the decision of the district court and remand the case for further consideration.

## I. Background Facts and Proceedings.

Van Buren County is located in the southeastern part of Iowa. It is primarily a rural county and is one of Iowa's least populated. Between the 1980 and 1990 census, the population of Van Buren County decreased from 8626 to 7676 citizens. The unemployment rate is relatively high compared to other parts of the state, and most residents work in agricultural-related fields.

The county has one hospital. It is located in the town of Keosauqua and is owned by Van Buren County Hospital. The hospital property has always been exempt from property taxation.

In 1997, the hospital constructed an addition to its existing complex at the cost of $3.5 million. The addition included a new emergency room, a physician's clinic, and a specialist's clinic.

The hospital constructed the clinic areas as part of a plan to employ the three physicians who practiced medicine in the community and provide them with an area to treat and care for their patients in a

clinic setting. This plan was conceived after the hospital had been unable to recruit new physicians into the area during the preceding six years. During this time, the number of physicians who utilized the hospital and provided care to the hospital patients decreased. Furthermore, it was anticipated that there would soon only be two physicians at the hospital. The three physicians practiced in a private clinic in Keosauqua, with a satellite clinic in Farmington. There were two other physicians who provided medical services in Van Buren County, but they were not affiliated with the hospital. One physician maintained a satellite clinic in Farmington, and the other maintained a satellite clinic in the town of Milton.

The small number of doctors serving the hospital, including the emergency room, made it increasingly difficult for the hospital to provide adequate care to the residents of the county. The hospital trustees feared the hospital would lose its ability to provide emergency and obstetric services. They also feared the lack of physicians could eventually force them to close the hospital. Without hospital services, residents would be forced to travel twenty to thirty miles to obtain emergency treatment.

In response to the growing crisis facing the hospital, the trustees entered into an agreement with the three physicians in the community to purchase their medical practice and hire them as employees of the hospital. Under the physician-employee agreements entered into by the hospital, the employee doctors were required to provide health care services at both the Keosauqua hospital and the clinic in Farmington. The doctors were responsible for hospital rounds, responding to emergency calls, and sharing on-call responsibilities. The employment agreement further prohibited the doctors from engaging in the private practice of medicine, either independently or with another association of physicians.

Physician compensation was based, in part, on each individual doctor's productivity. In addition to a base salary, each doctor received fifty-five percent of the collected billings in excess of the base salary, with some limitations and adjustments. Despite the presence of incentive compensation, the hospital mandated the employee doctors to provide treatment to individuals in emergency situations, irrespective of the patient's ability to pay. The compensation arrangement was considered very competitive for rural physicians, and the trustees believed the nature of the arrangement would attract other physicians to the area.

In a similar manner, the hospital created a specialty-physician clinic in the hospital. This was done around the same time the local doctors were hired as employees. The decision to create a specialty clinic stemmed from the unavailability of specialty care in the community. Specialists did not frequent the community on a regular basis, if at all. Consequently, residents were forced to travel long distances to receive the necessary care. After failing to successfully attract specialists to the area, the hospital entered into an agreement with the University of Iowa Hospitals and Clinics to provide part-time specialty care to the residents of Van Buren County. Under the agreements, approximately twenty-two specialists provide treatment and consultation services in such areas as cardiology consultation, pulmonary diseases, rheumatology, psychiatric, vascular surgery, hematology/oncology, general orthopedics, general dermatology, and general urology.

The specialists in each care area see patients in varying intervals every month, resembling a clinic-type format. To com-

ply with federal law, the hospital entered into a lease with the University of Iowa at the market rate. Pursuant to the lease agreement, a full-day rental of the clinic space costs $75, while a half-day rental is $50. In general, each specialist visits the hospital from one-half day to three days each month. Furthermore, the hospital maintains control over the specialty clinicians by furnishing supplies and staff. In addition, most patients schedule appointments by directly contacting the hospital. However, the hospital is not involved with the patients' bills and does not receive revenues from the specialty doctors' services.

Around the same time as the clinics were established, the hospital also created a Job Opportunities Department located at the main hospital campus in Keosauqua. The objective of Job Opportunities is to provide employment assistance, placement, counseling, and evaluation for the unemployed residents of Van Buren County. Additionally, Job Opportunities provides clients with access to free computer usage and professional clothing. The clients are primarily mentally and physically disabled and are not charged for the assistance. It is the only employment service bureau in the community. In placing clients, Job Opportunities contracts with entities within and outside of Van Buren County for vocational services. If Job Opportunities does contract with a county other than Van Buren County, Van Buren County remains involved by subcontracting under the original agreement.

The hospital also created a Farm Health and Safety Department located in the Farmington clinic. This division is also associated with the University of Iowa, and serves as an agricultural health and safety center for the southeastern counties of Iowa. The purpose of the agricultural center is to educate agricultural workers and other individuals who must satisfy federal and state safety guidelines on the prevention of work-related injuries, deaths, and illnesses. The center also provides free health screenings to Van Buren County farmers.

Following the construction of the hospital addition, the Van Buren County Assessor granted tax-exempt status to the new emergency room area. However, it assessed those areas of the new addition used as clinics.[1] It also assessed the area of the hospital devoted to the Job Opportunities Department, as well as the Farmington Clinic including the Farm Health and Safety Department.

The hospital timely protested the tax assessments. *See* Iowa Code § 441.37(1)(c) (permitting protest of assessment by taxpayer). The Board denied the hospital's claims for exemptions and affirmed the assessor's decision. The hospital then appealed to the district court. *See id.* § 441.38(1) (protesting taxpayer may appeal from board of review's decision to district court).

At the trial before the district court, the hospital administrator explained the reasoning underlying the Board of Trustees' decision to revise the original physical and operational structures of the hospital. In evaluating the community's needs, the Board of Trustees found the hospital lacked essential services that needed to be provided in order for the hospital to remain viable. Similarly, the failure of other small rural county hospitals to address their community's needs had resulted in termination of the facilities. The hospital

---

1. The assessor granted the hospital an exemption on a pro-rata basis of the common areas of the new addition.

administrator testified that the hospital's primary responsibility was to satisfy the community's health care needs in a cost-effective manner and in a close proximity. The administrator acknowledged the financial stability of the hospital was a concern to the hospital trustees.

The Board presented two expert witnesses. A certified public accountant concluded the hospital did not qualify for the charitable institution exemption because it provided a minimal amount of charity care. Moreover, the accountant found the hospital enforced an aggressive collections policy, which was indicative of a pecuniary profit motive. Another expert witness was a professor of economics at Iowa State University. He found the operating practices of the specialty clinics reflected the operation of a business for profit. Several doctors who used the clinic acknowledged their treatment of the hospital patients was a for-profit enterprise. Furthermore, the professor found a lack of public or charitable use. This conclusion stemmed from his belief that county government need not provide medical clinics that can appropriately be provided by the private marketplace. Lastly, several real estate appraisers testified to their evaluations of the assessed property areas.

The district court denied the hospital's claims for exemption from taxation on all four property areas. The hospital appeals. It claims the disputed property is entitled to exempt status under either the municipal use or charitable institution exemptions. The Board counters municipal property, such as county hospitals, can qualify for exemption only under the municipal use exemption of section 427.1(2). Nevertheless, the Board asserts the district court properly rejected the hospital's exemption claims because the hospital did not use the disputed areas for public or charitable objectives and operated them with a view for a pecuniary profit.

## II. Standard of Review.

■ An appeal from a decision of a board of review concerning the tax assessment of property resides in equity. *Id.* § 441.39 ("The court shall hear the appeal in equity . . . ."); *Friendship Haven, Inc. v. Webster County Bd. of Review*, 542 N.W.2d 837, 840 (Iowa 1996). Thus, we review tax exemption appeals de novo. *Carroll Area Child Care Ctr., Inc. v. Carroll County Bd. of Review*, 613 N.W.2d 252, 253 (Iowa 2000); *City of Osceola v. Bd. of Review*, 490 N.W.2d 539, 540 (Iowa 1992). Our determination in each case depends upon the unique facts and special circumstances presented. *City of Osceola*, 490 N.W.2d at 540; *Dow City Sr. Citizens Hous., Inc. v. Bd. of Review*, 230 N.W.2d 497, 499 (Iowa 1975); *South Iowa Methodist Homes, Inc. v. Bd. of Review*, 173 N.W.2d 526, 533 (Iowa 1970).

■ We give weight to the factual findings rendered by the district court, but are not bound by them. *Carroll Area Child Care Ctr., Inc.*, 613 N.W.2d at 253–54. The burden of proving an entitlement to tax-exempt status is placed on the taxpayer seeking the exemption. *City of Osceola*, 490 N.W.2d at 540. Furthermore, the taxpayer must establish the tax-exempt status by a preponderance of the evidence. *Carroll Area Child Care Ctr., Inc.*, 613 N.W.2d at 254.

## III. Exemption From Property Tax.

Our legislature exempts certain categories or classes of property from taxation. Iowa Code § 427.1. Two of these exemptions are at issue in this case. One is the exclusion for property of a county or other governmental subdivision, commonly referred to as the municipal exemption. *Id.* § 427.1(2). The second is the exemption

for property of a charitable institution. *Id.* § 427.1(8). We first consider the county property exemption under section 427.1(2).

### A. Municipal Exemption.

The municipal exemption portion of the statute exempts from taxation:

> The property of a county ... when devoted to public use and not held for pecuniary profit. . . .

*Id.* § 427.1(2).

■ Generally, we strictly construe statutes exempting property from taxation, and resolve any doubts in favor of taxation. *City of Oskaloosa v. Bd. of Review,* 490 N.W.2d 542, 545 (Iowa 1992). This approach is followed because exemptions from taxation are generally disfavored as contrary to the democratic notions of equality and fairness, and exist solely due to legislative grace. 71 Am.Jur.2d *State and Local Taxation* § 233, at 511 (2001). Yet, this strict rule does not require a construction that is so narrow that it defeats the legislative purpose. *Johnson v. Bd. of Supervisors,* 237 Iowa 1103, 1108, 24 N.W.2d 449, 452 (1946). We observe that our Iowa statute exempting county property from taxation is consistent with the traditional notion that government-owned property is immune from taxation when devoted to public use. 71 Am.Jur.2d *State and Local Taxation* § 267, at 547. Clearly, our legislature wanted to maintain this practice by establishing the municipal exemption.

■ We have previously recognized that the municipal exception under section 427.1(2) establishes a three-part exemption test: "(1) the property must be owned by the (county); (2) the property must be devoted to public use; and (3) such property must not be held for pecuniary profit." *City of Osceola,* 490 N.W.2d at 541 (quoting *Airport Bldg. Corp. v. Linn County Assessor,* 406 N.W.2d 806, 808 (Iowa Ct. App.1987)). Thus, county property is not exempt from taxation solely because it is county property. *See City of Oskaloosa,* 490 N.W.2d at 545. Instead, the exemption depends on the manner and characteristic of the use of the property by the county. The property must be "devoted to public use" and not held "for pecuniary profit." Iowa Code § 427.1(2).

Under this standard, the exempt status of county or other governmental subdivision property will ultimately rest with the particular facts of each case. *See City of Osceola,* 490 N.W.2d at 540. The statute, like many others, is necessarily general, and each case must be examined in light of the general statutory parameters as well as the legislative purpose for the municipal exception. Each claim for a municipal exception should fit within the *theory* behind the exemption. *See City of Muscatine v. Swickard,* 232 Iowa 1175, 1186, 6 N.W.2d 23, 28 (1942); *Readlyn Hosp. v. Hoth,* 223 Iowa 341, 345, 272 N.W. 90, 92 (1937) (claim for exemption will be sustained only if shown to be within the letter and spirit of the law).

We have previously recognized that the theory behind exempting county or municipal property is county or municipal residents should not be taxed to raise money to pay taxes on their own property. *City of Muscatine,* 232 Iowa at 1186, 6 N.W.2d at 28. If a governmental entity is forced to pay tax on its own property, it would normally be forced to levy a new tax to pay the tax. 71 Am.Jur.2d *State and Local Taxation* § 267, at 548. The ultimate effect of such a tax spiral is the public will be taxing itself to raise money to pay itself. *State Bd. of Equalization v. City of Lander,* 882 P.2d 844, 850 (Wyo.1994) (citing 16 Eugene McQuillan, *The Law of Municipal Corporations* § 44.57, at 206

(3d ed.1994)). This approach provides no real benefit, and only takes money out of one pocket and places it in another. *State Bd. of Equalization*, 882 P.2d at 850 (citing 2 Thomas M. Cooley, *The Law of Taxation* § 621, at 1317 (4th ed.1924)); 2 Am.Jur.2d *State and Local Taxation* § 267, at 548. Consequently, the theory for exempting county property rests with a rather fundamental principle of government that there should be no unnecessary interference imposed on government in carrying out its purposes and obligations. 71 Am.Jur.2d *State and Local Taxation* § 267, at 548.

█ The rationale behind the county exemption explains the necessity for the "public use" and "pecuniary profit" elements of this statute. If a county owns property but uses it for a private purpose or in a proprietary manner, the justification for exempting the property from taxation is lost. The use of the property can generate the funds necessary to pay the taxes or the use can be assumed by a private entity. Public property held for private purposes and used for profit should be subject to tax in the same manner as property of private corporations or individuals. 71 Am.Jur.2d. *State and Local Taxation* § 282, at 563. Thus, we have held that a city may be taxed for electrical transmission lines when they are used to provide power outside the city borders. *City of Muscatine*, 232 Iowa at 1186, 6 N.W.2d at 28. Under these circumstances, nonresidents of governmental subdivisions receive the principal benefit from the use of the lines. *Id.* Additionally, a city has no obligation to provide electrical power to citizens beyond its border. *Id.* When it does so, it is using property as a private corporation and should be taxed accordingly. Likewise, we have held that a city building leased to the United States Postal Service to process and deliver mail is not exempt from taxation under the municipal

exception because the use of the building is outside the city's obligations to its citizens. *City of Oskaloosa*, 490 N.W.2d at 545. The important factor is that the municipality is primarily using land as a private corporation.

On the other hand, we have held that the portion of a city airport terminal used as a residence for the airport manager nevertheless constitutes public use of land when the duties of the manager essentially require round-the-clock services. *City of Osceola*, 490 N.W.2d at 542. In such a situation, the use of the property as a private residence is incidental to the predominate public purpose. *Id.* Additionally, we have held that the collection of rent from pasture land used by a municipality as an essential water shed around its municipal waterworks system was incidental to the public use of the land and did not destroy the exempt status of the land. *City of Osceola v. Bd. of Equalization*, 188 Iowa 278, 281, 176 N.W. 284, 285 (1920).

█ Clearly, the distinction between public and private use can be fine, and the uses of property by a governmental entity can have characteristics of both public and private use. Thus, the test that has emerged from our cases interpreting the "public use" element of section 427.1(2) is whether the property in dispute is primarily used to carry on "reasonably necessary or essential facilities to the efficient operation and maintenance" of the public use for which the exemption is authorized. *City of Osceola*, 490 N.W.2d at 542 (quoting *City of Cheyenne v. Bd. of County Comm'rs*, 484 P.2d 706, 709 (Wyo.1971)). Our statute no longer requires the property to be used "entirely" for public use. *Id.* at 541–42. Accordingly, municipal property is exempt if it is used for a "predominately public purpose and only incidentally for a private purpose." 71 Am.Jur.2d *State and Local Taxation* § 280, at 560. An inciden-

tal private benefit of public property does not affect its character as property devoted to public use. *City of Osceola,* 188 Iowa at 281, 176 N.W. at 285.

A similar approach is taken to the "not ... held for pecuniary profit" element of the statutory exemption. When the primary use of property is public, it is not subject to taxation simply because the municipality incidentally receives revenue from the operation of the property. *City of Osceola,* 188 Iowa at 278, 176 N.W. at 285; 71 Am.Jur.2d *State and Local Taxation* § 282, at 563. Of course, the public use of property held for a profit is subject to taxation.

The parties agree all four areas in dispute in this case are owned by the county. Thus, the fighting issue centers on the public use and pecuniary profit requirements.

The overall operation of a hospital by a county fits the public use requirement. Counties are permitted by statute to establish hospitals. *See generally* Iowa Code ch. 347 (county hospitals); *see also* Iowa Code § 331.301(1) (general powers of a county include improving health and welfare of its citizens); § 331.441(2)(c)(8) ("general county purpose" includes a county public hospital). Additionally, the board of hospital trustees, which is the governing body of the hospital, is authorized to do those "things necessary for the management, control and government" of the hospital. Iowa Code § 347.14(11). Furthermore, the mission statement adopted by the hospital trustees in this case reveals the hospital is committed to "providing health care and education to the public at large" and to provide its residents with "comprehensive state-of-the-art health care," including "related interests that contribute to the health and welfare of both the hospital and the community."

A hospital is clearly committed to serving the public. Yet, we recognize that such declarations and commitments are not controlling in determining an exemption from taxation. *See Readlyn Hosp.,* 223 Iowa at 344, 272 N.W. at 91. Although they may be considered, the controlling consideration turns to the actual use made of the property. *See South Iowa Methodist Homes, Inc.,* 173 N.W.2d at 532. Under our test, we must first determine if the primary use of each of the four areas in dispute is to carry on "reasonably necessary or essential facilities to the efficient operation and maintenance" of the county hospital. Additionally, we must determine if the areas in dispute exist to make a profit.

### 1. Employee–Physician Clinics.

The landscape of rural Iowa is changing, and so too are the methods and manner of delivering public services. For sure, in years gone by, physician clinics were operated as private businesses independent of hospitals, and they were not considered essential to the operation of a hospital. *See Readlyn Hosp.,* 223 Iowa at 345, 272 N.W. at 92. A community with a hospital would attract doctors to the area who would, in turn, establish their own clinic practices, much like certain natural resources or unique features of a community attract various interdependent enterprises. Thus, physician clinics have traditionally been considered to be independent of hospitals, and clinic services are recognized to serve a slightly different purpose in delivering health care services than by hospitals. *See City of Springfield v. Comm'r of Revenue,* 380 N.W.2d 802, 806 (Minn.1986). Yet, even the most ardent traditions are not always impervious to the march of time.

The record in this case reveals that Van Buren County, and perhaps other rural

areas around the country, have been experiencing a critical shortage of physicians. Without a sufficient number of physicians to staff a hospital, or any physicians at all, it is not unreasonable to believe that the hospital will eventually be forced to abandon its noble pursuit, and become a remnant of the past. The county trustees responsibly and thoughtfully responded to this emerging crisis by considering new ways to retain and attract physicians to preserve the hospital and maintain its ability to provide quality health care to the community. While the approach adopted by the trustees crossed traditional paths, we have no occasion to doubt the underlying motive or purpose.

We fully understand that the operation of physician clinics may in another period of time have been viewed to be outside the role of county government. We also recognize our obligation to preserve the sound principles of the past and avoid unwarranted exemptions to taxation when the objects and methods of exempting property become too remote from the traditionally recognized objects and methods. *Harvard Cmty. Health Plan, Inc. v. Bd. of Assessors*, 384 Mass. 536, 427 N.E.2d 1159, 1163 (1981) (quoting *Boston Chamber of Commerce v. Assessors of Boston*, 315 Mass. 712, 718, 54 N.E.2d 199, 202 (1944)). However, changes in social and economic conditions often require government to change directions and consider new approaches to the delivery of services. Moreover, our traditional approach to construing a statute providing for an exemption from taxation must not tie us to past notions of the meaning of the statutory phrase "public use." Instead, we must carefully construe the phrase consistent with the objectives and purposes sought to be accomplished by the statute, while considering the degree to which these objects affect public welfare. *Roe v. Kervick*, 42 N.J. 191, 199 A.2d 834, 842 (1964). This necessarily requires us to construe "public use" in a flexible manner to permit the statute to meet the changing needs of the public and society. In addressing the meaning of "public purpose," the New Jersey Supreme Court thoughtfully said:

> Generally speaking, it [public purpose] connotes an activity which serves as a benefit to the community as a whole, and which, at the same time is directly related to the functions of government. Moreover, it cannot be static in its implications. To be serviceable it must expand when necessary to encompass changing public needs of a modern dynamic society. Thus, it is incapable of exact or perduring definition. In such instance where the test is to be applied the decision must be reached with reference to the object sought to be accomplished and to the degree and manner in which the object affects the public welfare.

*Id.*

The evidence in this case supports the conclusion that the clinics, in this rural setting, have become a reasonably necessary and essential component of the viable overall operation of this hospital. The use of the property as physician clinics constitutes a public use because the clinics have become an important link to the very existence of the hospital. This was supported by the evidence in the case and the decision of the hospital trustees. The slight differences in purposes between clinics and hospitals may continue to exist in rural Iowa, but the two entities have nevertheless become uniquely interwoven in a rural setting. For sure, physician clinics provide a private benefit, but we think such a benefit in this case fits well within the permissible incidental private benefit to the greater public benefit.

The Board points to decisions in numerous other jurisdictions that have refused to exempt physician clinics merged into hospital settings from property taxation, even when faced with claims that the clinics are necessary to recruit and maintain physicians or to satisfy patient needs. *See Crittenden Hosp. Ass'n v. Bd. of Equalization,* 330 Ark. 767, 958 S.W.2d 512 (1997); *Chisago Health Servs. v. Comm'r of Revenue,* 462 N.W.2d 386 (Minn.1990); *City of Springfield,* 380 N.W.2d at 805; *St. Clair Hosp. of Monroe, Wis., Inc. v. City of Monroe,* 209 Wis.2d 364, 563 N.W.2d 170 (Ct.App.1997). However, a review of these cases reveals critical differences between the statutory exemption for public property under consideration and our statute. One notable difference is the frequent statutory requirement in other jurisdictions that the public property be used "exclusively" for public purposes. *See City of Springfield,* 380 N.W.2d at 804; *Crittenden Hosp. Ass'n,* 958 S.W.2d at 513. We have previously indicated that our legislature has broadened our municipal property exemption by removing the word "entirely" from the statute. *See City of Osceola,* 490 N.W.2d at 541–42. Additionally, these cases from other jurisdictions recognize, as we have, how the particular facts of each case ultimately guide the outcome, as well as the influence of the standard of review. *See South Iowa Methodist Homes, Inc.,* 173 N.W.2d at 533 ("[i]n each case there is some distinguishing feature or statute" which commands us to decide each case on its own unique facts); *see also City of Springfield,* 380 N.W.2d at 805 (exemption denied but circumstances of case presented extremely close decision); *Greater Anchorage Area Borough v. Sisters of Charity,* 553 P.2d 467, 471 n. 12 (Alaska 1976) (case did not raise question whether exemption was necessary to secure services of doctors for the hospital to function).

In considering all the facts in this case, we conclude the physician clinics operated by the Van Buren County Hospital are devoted to public use. We next turn to consider whether the clinics are held for a pecuniary profit.

The Board points to evidence that the revenue from the clinic exceeded expenses in 1998 and 1999, which is indicative of a pecuniary profit. However, these figures do not include such unassigned expenses as employee benefits and building and equipment depreciation. Additionally, the community contributes a substantial amount of volunteer hours. This diminishes the amount of salaries paid and therefore decreases the expense totals. *Evangelical Lutheran Good Samaritan Soc'y v. Bd. of Review,* 267 N.W.2d 413, 415 (Iowa Ct.App.1978). In any event, any realized surpluses are reinvested into the hospital and clinics through maintenance, repairs, and expansion of the facilities. *See, e.g., Mingledorff v. Vaughan Regional Med. Ctr., Inc.,* 682 So.2d at 415, 418 (Ala.1996); *Bethesda Found. v. Bd. of Review,* 453 N.W.2d 224, 228 (Iowa Ct.App.1990); *Twilight Acres, Inc. v. Bd. of Review,* 346 N.W.2d 40, 42 (Iowa Ct.App.1984); *Evangelical Lutheran Good Samaritan Soc'y,* 267 N.W.2d at 416; *Appeal of Cmty. Gen. Hosp.,* 708 A.2d 124, 130 (Pa. Commw.Ct.1998); *Med. Ctr. Hosp. of Vermont, Inc. v. City of Burlington,* 152 Vt. 611, 566 A.2d 1352, 1357 (1989). Additionally, no private individuals affiliated with the hospital, such as the hospital administration or Board of Trustees, reap individual benefits from excess funds. *Mingledorff,* 682 So.2d at 418; *Twilight Acres, Inc.,* 346 N.W.2d at 42; *Evangelical Lutheran Good Samaritan Soc'y,* 267 N.W.2d at 416 n. 7; *Hotel Dieu v. Williams,* 410 So.2d 1111, 1112 (La.1982); *Appeal of Cmty. Gen. Hosp.,* 708 A.2d at 130. In fact, members of the Board of Trustees receive no com-

pensation. Iowa Code § 347.19; *see Twilight Acres, Inc.*, 346 N.W.2d at 42; *Evangelical Lutheran Good Samaritan Soc'y*, 267 N.W.2d at 416 n. 7. Moreover, in order for small rural county hospitals like Van Buren County Hospital to survive financially, the operating income must exceed expenses. *See Twilight Acres, Inc.*, 346 N.W.2d at 42 (any entity must generate more revenue than expenses to remain in operation). Additionally, profit or loss is not the determinative test. An institution that operates at a loss is not necessarily guaranteed a tax-exempt status. *Mayflower Homes, Inc. v. Wapello County Bd. of Review*, 472 N.W.2d 632, 634 (Iowa Ct. App.1991); *see Readlyn Hosp.*, 223 Iowa at 345, 272 N.W. at 92 (denying hospital tax exemption, despite fact that hospital operated at a loss).

We have previously determined the hospital established the clinics for the institutional purpose of maintaining the future of the hospital. Even if the clinics realize a profit from time to time, this does not mean the property is held for the purpose of making a financial profit. *See Smyth County Cmty. Hosp. v. Town of Marion*, 259 Va. 328, 527 S.E.2d 401, 405 (2000); *see also Richards v. Iowa Dep't of Revenue*, 414 N.W.2d 344, 353 (Iowa 1987) (determining whether a patient will be able to pay at least some charges does not indicate pecuniary intent); *Evangelical Lutheran Good Samaritan Soc'y*, 267 N.W.2d at 416 ("To require that the society sustain operating deficits in order to perpetuate its real estate tax exemption is unsound and would discourage responsible management practices."). The clinics are held for the purpose of maintaining the overall operation of the hospital, and any profit it may realize is merely incidental.

Finally, the Board argues that the effect of an exemption for the physician clinic areas placed two other small part-time clinics that provide family practice services in other towns in the county at a competitive disadvantage with the hospital clinic because these two clinics pay property tax. While we question the dubious nature of the claim of unfair competition, we acknowledge the general policy of the law to make all property owners share in the common burden of taxation. Moreover, an exemption from uniform taxation tends to give an unfair competitive advantage to the exempted facility over similar privately owned facilities. *Chisago Health Servs.*, 462 N.W.2d at 391. Yet, while this unfair result may be a justification for taxing public property used in a private manner, it is not a reason to tax public property put to public use. Our legislature has made the determination to exempt municipal property used for public purposes, and we have determined under the facts of this case that the hospital is not primarily operating the clinic for private use and any private use is merely incidental to the greater public purpose. Consequently, any unfair competitive advantage is similarly incidental, and a product of the judgment of our legislature in providing for a municipal exception. In truth, we think the exemption claimed by the hospital fits neatly within the rationale for exempting public property.

## 2. Specialty Clinic.

■ Although the specialty clinic is not tied to the future viability of the hospital to the same degree as the physician clinic, it does intimately relate to the ability of the hospital to provide the level of medical care needed in the community. Thus, like the physician clinic, the use of part of the hospital as a specialty clinic combines public and private use. The question turns to whether the private nature of the use is incidental or primary.

We have previously found government property leased to a private entity exempt from property taxation where the lease was devoted to public use and not held for pecuniary profit. *See City of Osceola*, 490 N.W.2d at 542 (referencing 1967 Op. Iowa Att'y Gen. 57 (1968)); *Airport Bldg. Corp. v. Linn County Assessor*, 406 N.W.2d 806, 811 (Iowa Ct.App.1987) (city leased land to private entity to enable construction of government facility); *see also* 71 Am. Jur.2d *State and Local Taxation* § 280, at 561 ("Use of exempt property by a private party under a lease agreement does not defeat the exemption if the private party's use is the public use underlying the exemption."); § 324, at 621 (facility remained exempt where lease "directly related to the operation of the hospital"). On the other hand, we have found leased municipal property to fall outside the municipal exemption when the use of the leased property did not relate to the duties of municipality. *City of Oskaloosa*, 490 N.W.2d at 544.

We acknowledge a hospital facility is not entitled to an exemption if physicians lease space from the hospital for the purpose of furthering their private practice. *See Greater Anchorage Area Borough*, 553 P.2d at 471; *St. Mary's Med. Ctr. of Evansville, Inc. v. State Bd. of Tax Comm'rs*, 571 N.E.2d 1247, 1249 (Ind.1991); *St. John's Mercy Hosp. v. Leachman*, 552 S.W.2d 723, 726 (Mo.1977); *Genesee Hosp. v. Wagner*, 364 N.Y.S.2d 934, 943 (1975); *Grand Prairie Hosp. Auth. v. Dallas County Appraisal Dist.*, 730 S.W.2d 849, 851 (Tex.Ct.App.1987); *Gifford Mem'l Hosp. v. Town of Randolph*, 119 Vt. 66, 118 A.2d 480, 484 (1955). Yet, the lease agreement in this case does not permit the specialty doctors to maintain their medical practice at the hospital. Instead, the purpose underlying the lease agreement is to provide health care services otherwise unavailable in Van Buren County. The arrangement was not made for the benefit of the specialists, but for the benefit of the community. Moreover, as with the physician clinic, the need for the specialty clinic can be traced to the rural setting, and the use of the area of the hospital for specialty care is reasonably necessary to the operation and maintenance of the hospital. The private benefit to the physicians is incidental to the greater public use.

The evidence in this case also does not support a finding that the specialty doctors are utilizing the clinic space to further their own private practice for pecuniary profit. The lease agreement between the University of Iowa and the hospital is not a standard lease agreement in which the lessor relinquishes substantial rights to the lessee. *Cf. Milton Hosp. & Convalescent Home v. Bd. of Assessors*, 360 Mass. 63, 271 N.E.2d 745, 748 (1971) (hospital essentially became a landlord with no rights to exercise except for those delineated in lease agreement). The specialty doctors are not granted unlimited control and discretion under the lease agreement. The lease agreement simply provides for the operation of a clinic for a specified number of days each month. The doctors are not permitted to "pick and choose" patients as private practitioners operating their own practices would be entitled. Each doctor leases the space for only a few days each month. In exchange for the office space, the doctors must pay a nominal amount of rent and, ordinarily, are not required to pay for additional expenses. Moreover, the doctors are not engaging in a competitive practice, because there are no other specialty physicians in the area. We find all of these facts favor a finding of a lack of pecuniary intent.

### 3. Job Opportunities and Farm Health and Safety Divisions.

 The purpose of the Job Opportunities division is to assist individuals, pri-

marily those who are disabled, to find employment. The purpose of the Farm Health and Safety division is to educate members of the agricultural community in the methods of preventing farm-related injuries, fatalities, and illness. In addition to creating hazardous waste guideline materials for businesses, this division administers free health screenings for farmers as well as other educational and preventative services.

Although these purposes do not relate to the traditional role of health care, they clearly relate to the overall health and welfare of the community. *See Sebastian County Equalization Bd. v. W. Ark. Counseling & Guidance Ctr., Inc.,* 296 Ark. 207, 752 S.W.2d 755, 758 (1988) (gymnasium and meeting rooms used for both clinic patients and general public did not affect mental health center's exempt status). The major changes in the health care area have necessitated corresponding changes in definitional predicates. *Harvard Cmty. Health Plan, Inc.,* 427 N.E.2d at 1163. Here, one program helps prevent accidents that would require medical services and the other program relates to the long-term overall care needs for those who have suffered health problems. Considering the changing nature of health care, we have no difficulty in concluding that these programs are reasonably necessary facilities to the effective and efficient operation of the hospital, much like prenatal services offered by the hospital in another area of the complex provides parenting skills and prepares expecting parents for the birthing process. Similarly, the agricultural health care services provided by the Farm and Health Safety division seek to prepare farmers for unexpected accidents that may arise in the workplace, as well as to prevent such accidents from occurring. Moreover, the hospital declares part of its responsibility as a rural hospital to provide for the welfare of farmers, which consti-

tutes a significant portion of the community's employed population. Likewise, the Job Opportunities division fosters care of the disabled and assists them in a full and complete recovery. These programs not only reduce the burdens on the hospital and serve the health and welfare of the community, but tend to diminish the burdens on government in general.

We conclude both areas constitute a public use and any private benefit would be incidental to the public use. Likewise, any profit would also be incidental to the primary purpose and role within the spectrum of hospital services.

### B. Charitable Exemption.

The charitable exemption under section 427.1(8) utilizes a slightly different test than the municipal exemption under section 427.1(2). Section 427.1(8) exempts property "used ... by [charitable institutions] solely for their appropriate objectives." This standard does not limit the exemption to uses that are actually necessary, but only requires that the use be proper and appropriate to effectuate the objectives of the charitable institution. *Congregation B'Nai Jeshurun v. Bd. of Review,* 301 N.W.2d 755, 756–58 (Iowa 1981). However, when a charitable institution devotes property to such a purpose, the property must be used exclusively by that institution for that purpose. *Id.* at 758.

Because we have determined that each of the designated areas in this case fall within the county exemption under section 427.1(2), it is unnecessary for us to consider the charitable exemption. Similarly, it is unnecessary for us to address the claim raised by the Board that the charitable institution exemption is not available to a

county hospital because a specific exemption exists for county property.[2]

### IV. Conclusion.

We conclude under the particular facts of this case that physician clinics and specialty clinics owned and operated by a county hospital are exempt from property taxation under the municipal use exemption of section 427.1(2). We also conclude that the property operated by the county hospital to provide farm health and safety information and services is exempt from property taxation under section 427.1(2). Finally, we conclude the property used by the hospital for employment opportunities is also exempt. We remand the case to the district court for entry of judgment consistent with this opinion. *See St. Ambrose Univ. v. Bd. of Review,* 503 N.W.2d 406, 409 (Iowa 1993).

**REVERSED AND REMANDED.**

All justices concur except TERNUS, J., takes no part.

---

**2.** The Board's argument is based on our decision in *Merged Area (Education) VII v. Bd. of Review,* 326 N.W.2d 310, 312–13 (Iowa 1982), where we held that a school corporation was limited to claims for property tax exemption as an educational institution under section 427.1(2) and could not claim an exemption as a charitable institution under section 427.1(9) (1979) (predecessor to 427.1(8) (1997)). Yet, we have previously recognized that subsections of our exemption statute overlap. *See id.* at 313 (citing *McColl v. Dallas County,* 220 Iowa 434, 441, 262 N.W. 824, 827 (1935)). In fact, in *McColl,* we specifically held property owned by a county could also be found exempt under another exemption provision. *See McColl,* 220 Iowa at 441, 262 N.W. at 827. We concluded a county-owned school was an "educational institution" and, consequently, exempt from taxation under both the municipal use and school system exemptions. *See id.* In *Merged Area,* we found *McColl* inapplicable because we did not believe our legislature intended to classify a school corporation as a charitable institution. *Merged Area,* 326 N.W.2d at 313.